## CLARK *v.* DETROIT & MACKINAC RAILWAY CO.

1. EVIDENCE — ADMISSIBILITY — NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

> In the absence of evidence pointing to one cause or another as to the sinking of a rowboat with its occupants, so long as the cause is plainly conjectural, it is proper to prove, in an action for the negligent death of an occupant of such rowboat against the one renting it, as accounting for the disappearance of the boat, that the men who were in it had a few minutes earlier rocked the boat.

2. DEATH—PRESUMPTIONS—NEGLIGENCE—EVIDENCE.

> Where no one saw a hired rowboat sink with its occupants, the presumption that those on board were using due care at the time it sank is to be indulged only to relieve a plaintiff from an inference of negligence, and not to supply evidence of the negligence of the renter of the boat.

3. NEGLIGENCE—DEATH BY DROWNING—LIABILITY.

> Negligence and consequent liability of the letter of a rowboat for the death of an occupant by drowning cannot be predicated upon the failure to furnish a boat, which, when capsized, would float, supporting in the water four clinging passengers.

4. SAME—DEATH BY DROWNING—EVIDENCE—INSTRUCTIONS.

In an action against the renter of a rowboat to recover for the death of an occupant alleged to be due to the sinking of the boat because of its defective condition while deceased and three other persons, who were also drowned, were in it, *held*, that the jury should have been instructed that negligence of defendant was not made out, and that, if negligent, it was purely conjectural whether the loss of the boat and of lives was the result of its negligence. KUHN, C. J., and BIRD and MOORE, JJ., dissenting.

5. SAME—NEW TRIAL.

In an action against the letter for hire of a rowboat to recover for the death of plaintiff's intestate, alleged to be due to the sinking of the boat because of its defective condition, a new trial was awarded plaintiff, although a judgment in her favor was reversed upon the record.

6. DEATH—WHO ENTITLED TO SUE—ACTIONS.

A mother who has been divorced from her husband, has remarried, and receives the earnings of her son, who lives with her, may maintain an action for the son's death.[1]

7. EVIDENCE—ADMISSIBILITY.

In an action against the renter of a rowboat for the death of an occupant, alleged to be due to the sinking of the boat because of defective condition thereof, evidence of the condition of other rowboats of defendant was inadmissible.

8. SAME—INSTRUCTIONS—APPEAL AND ERROR—CURING ERROR.

In an action against the letter for hire of a rowboat for death of an occupant, alleged to be due to the sinking of the boat because of its defective condition, the erroneous admission of evidence of the defective condition of other rowboats of defendant was not cured by the giving of a cautionary instruction.

9. SAME—WEIGHT OF EVIDENCE—QUESTION FOR JURY.

The weight of evidence is for the jury.

Error to Arenac; Sharpe, J. Submitted October 23, 1916. (Docket No. 24.) Decided July 30, 1917.

Case by Nettie M. Clark, administratrix of the estate of Milton Stocum, deceased, against the Detroit

---

[1] On right of deserted wife to recover for death or injury to child, see note in 31 L. R. A. (N. S.) 519.

& Mackinac Railway Company for the negligent kill-
ing of plaintiff's decedent.   Judgment for plaintiff.
Defendant brings error.   Reversed.

*Henry & Henry* (*James McNamara,* of counsel), for
appellant.

*William C. Cook,* for appellee.

OSTRANDER, J.   Four young persons, two boys and
two girls, were drowned in Saginaw Bay June 17,
1912.   They were Milton Stocum, 16 years old, Ion
Lincoln, Nellie Salmon, and Eva Ouilette, also minors.
They were riding in a rowboat which belonged to and
had been hired of the defendant at Linwood Park, a
resort owned and operated by defendant, to which in
summer it ran daily excursion trains.   Those named
and others, with their teachers, went to the park on
one of defendant's trains for a school picnic.   The
boys had twice before been out upon the waters of the
bay in the boat, the second time with two other girls.
Upon the third excursion upon the water they were
seen at some distance from shore and called to dinner
by one of the teachers, and waved a response to the
call.   Two others, who were rowing out, met them as
they were returning to shore.   In some manner, for
some reason, they soon thereafter disappeared and
were not again seen alive.   Their bodies were re-
covered a few days later.   A floating seat board, air
tank, and oar were found, which it is claimed were a
part of the boat.   This suit is brought by the mother
and administratrix of the estate of Milton Stocum,
who alleges in her declaration that defendant is liable
for the injury suffered by the said Nettie N. Clark,
mother, and Irwin Stocum, father, of the deceased
intestate, on account of his death.
   It is alleged in the plaintiff's declaration, after stat-
ing the general relations which existed between plain-

tiff's decedent and others in the same party and the defendant, that plaintiff's decedent, because of his tender years, was unable to judge, in hiring or using a boat for rowing purposes, the dangers arising from the condition and repair of the boat, its carrying capacity, from going upon the water without a skilled oarsman to handle the boat, from the leaky condition of the particular boat, the leaky condition of air bulkheads or tanks attached to the boat, from the rotten condition of the boat and of the strip of wood around the inner side thereof, to which was attached the seats with screw nails, and which held the air tanks in place, from overloading the boat, from going upon the water when a high sea was running, or from a momentary squall of wind. She says, therefore, that it became the duty of defendant to provide a reasonably safe and seaworthy boat; to provide for a prudent and careful inspection of it before renting it; to maintain the ends, sides, and bottom of said boat free from holes and leaks, that the same be water tight; to maintain the strip of wood around the inner side of said boat; to which was attached the prow and stern seats, including the air tanks, free from rot and other defects, thereby making said seats and air tanks secure and fast with screw nails to prevent the same from falling or pulling out in the event the said boat capsized while being rowed upon the water; to maintain the air tanks free from leaks and holes, preventing water entering them, should the boat for any reason ship water or be capsized; to refrain from renting boats to children of immature age without providing competent oarsmen to accompany them; to refrain from allowing a boat to be loaded with more persons than its rated carrying capacity; to refrain from allowing plaintiff's decedent and his companions to go out upon the water in the boat at a time when the wind was off shore and the sea running high; and to have

provided a competent beach patrol whilst its boats were in use upon said dangerous water. It is alleged that defendant negligently omitted, or failed to perform, such several duties, and that the boat

"without warning wrecked and fell to pieces upon said water, at a distance of about three-quarters of a mile out from shore, throwing said plaintiff's intestate and his said three companions into the water, at the same time causing said prow and stern seats, including the air bulkheads or tanks (being the nonsinkable device used in the construction of said boat) to pull loose and out, owing to the rotten condition of the strip of wood to which the same was attached with screw nails, and drift away and sink, causing said steel boat hull to sink beneath the surface of the water, whereby plaintiff's intestate and his said three companions were drowned in said water."

The personal representative of young Lincoln also instituted a suit against this defendant, which upon a trial was determined in favor of the defendant upon the opening statement of counsel for plaintiff. Upon error, the judgment of the circuit court was reversed and a new trial granted. Lincoln v. Railway Co., 179 Mich. 189 (146 N. W. 405, 51 L. R. A. [N. S.] 710). Upon the last trial the Lincoln Case and the Stocum Case were tried practically as one case and submitted to the same jury. There was a verdict returned for each plaintiff, and a separate judgment entered for each. A reference to the opinion of this court above referred to will disclose that it was concluded that upon the statement of plaintiff's counsel it could not be determined as matter of law that defendant was not, in some of the respects alleged, negligent, and that, upon the same statement, the presumption was that plaintiff's decedent exercised due care—a presumption sufficient to permit recovery, if negligence of defendant was made out.

Plaintiff declares that the persons entitled to the

personal estate of the intestate are herself and Irwin Stocum, his father, who "were entitled to the services and earnings of decedent until he arrived at the age of 21 years." The testimony is that plaintiff and said Irwin Stocum are divorced, she having remarried; that the last information she had was that Stocum was alive; that Milton never lived with his father, nor contributed to his support, and had not been maintained by his father, and did give all of his earnings to his mother, the plaintiff. Defendant says of this situation that the father was, in law, entitled to the earnings of his son, and is the person entitled to be appointed administrator, and the sole person for whose benefit this suit could be maintained. 3 Comp. Laws, §§ 10427, 10428 (3 Comp. Laws 1915, §§ 14577, 14578). The statute provision is that the amount recovered in such an action shall be distributed to the persons and in the proportions provided by law in relation to the distribution of personal property left by persons dying intestate, and the limit of recovery is the amount of the pecuniary injury suffered by the persons entitled to the award. Over objection, testimony was admitted to the effect that Milton Stocum was very bright, with a very kind, cheerful, and sweet disposition—obedient.

There were 13 boats at the resort, numbered. The boats numbered 21, 22, 23, 24, 25, and 26 were bought at one time—in August, 1915—and 21, 22, and 23 were of the same size. Made by the Michigan Steel Boat Company of Detroit, Mich., they were known as "B 14-foot square stern special livery boats." They were 14 feet long, 44 inches wide amidships, and 14 inches deep amidships; height of bow 22 inches, and of stern 24 inches. The shells, or hulls, are described in the catalogue introduced in evidence in the following language:

"In considering the construction of our steel hulls,

bear in mind that they are not stamped or pressed; they are made of heavily galvanized steel (made to order for us), cut in regular pattern strips, lock seamed and welded together by pneumatic hammers. The seams are rolled the same as steel is rolled from the billet, thus retaining its original rigidity and strength. The seams in each of our boats are placed four inches apart and have four thicknesses of steel, which run from bow to stern, acting as a steel girder encircling the hull and making it practically impossible for same to leak or come apart. They are not bulky and heavy, as are the smooth skin boats, which have no force to resist the waves or any other object with which they might come in contact, and they are not built with the exposed rivets, as are the above-mentioned boats, so that it is only a question of time when the water and weather will wear the rivets away, and then the boat will rust, and leaks will spring when the boat receives a hard knock. It stands to reason that boats built with the concealed rivets and the lock seam can resist the waves and can stand knocks and jars, as the seams protect the hull and, the rivets being concealed, the water and weather cannot wear them away. All bolts, rivets, and screws in our boats are heavily galvanized. Every Michigan steel boat is equipped, bow and stern, with air-tight compartments, which pass a rigid hot-water test and are incased and not visible; therefore nothing can injure these air tanks, and each boat carries sufficient of these to insure the boat being absolutely nonsinkable —in fact, any Michigan steel boat filled with water will support its occupants."

The sterns of the boats were wood; there were three wooden seats, as well as a small wooden deck at the bow; and, running longitudinally, strips of wood, some of them used as flooring. The rear seat, like the other seats, was lower than the gunwale of the boat, and lower than the stern, which showed several inches above the seat. The boat in question was numbered 22. Plaintiff claims it was not seaworthy; defendant, that no proper testimony tends to prove it was unseaworthy, and that much testimony relating to the con-

dition of other boats was improperly admitted to prove the condition of the particular boat.

Stated very briefly, the testimony relating to the condition of boat No. 22 was that of George Walmsley, who testified that on the Sunday previous to the loss of the boat he rented a boat from the defendant, went out with it upon the bay, and while in the boat he marked certain initials upon the back seat. The seat board found after the catastrophe in question here, and claimed to have been in boat No. 22, was produced, and the witness identified the initials found upon it. He was out, he said, from a half to three-quarters of an hour. Asked to describe the condition the boat was in, he testified that it was in an unfit condition, was pulled apart "in back and there was rusty screws pulled out of the wood. The rear seat was loose and in right back of the rear seat is where the boat pulled apart—spread apart at the top." What he describes is that, by sitting in the center of the boat, facing the stern, there could be and was seen above the seat a space between the side of the boat and the board which made the back to the seat on the left-hand side. He testified that, when the man who was with him sat in the back seat, it did not leak. When the witness sat there, "I was heavier than what he was, it was down lower in the water, and the water splashing up came in, not a great quantity, but there was water coming in." He further testified that he "took hold of the side and kind of pulled in on it, and it seemed to be pretty weak," and that the sides of the boat went and came when the oars were used. He went ashore, he said, because he thought the boat was unsafe; that there was a small amount of water got into the boat; that the water was not very rough, and was not smooth. He further testified that by sitting in the center seat he could see that the boat at the stern was spread apart under the rear seat; he should judge it

was opened up—"I could see about an inch," so that if the water raised to within an inch of the seat, it could pour right in.   On cross-examination he admitted, what is obvious, that he could not sit in the center of the boat and see the condition of the stern of the boat below the rear seat, and did not see it, and that because he saw the corners above the rear seat somewhat open he assumed that the opening extended below the seat.   The boat had been used some by defendant's agent for two days before June 17th.

The two boys who used this boat on the afternoon in question, and who lost their lives, were twice out upon the bay with the boat before making the trip when the boat was lost.   After they had once been out with the boat, they invited two girls, one of them a teacher, to go upon the water with them, and they did go.   Lincoln sat in the middle seat and rowed the boat.   Milton Stocum sat upon the bow seat, and the two girls occupied the back seat.   They went out a half a mile, "more or less," and were out about 40 minutes.   The teacher, Miss Tebeau, testified that the boys rocked the boat and splashed water upon them, rocking the boat until it dipped water from both sides; Milton Stocum standing up in the front part of the boat and rocking it.   She was frightened, and asked the boys to take her back to shore, and that shortly after they did return to shore, when these two young ladies got out, and the boys then took in two other girls, who were with them when all were lost.   There was no water in the boat when these young ladies first named went out with the boys, but before they returned there was enough water in the boat so that their feet and dresses were wet.   The other young lady testified that, while she did not try to upset the boat, she, with the boys, rocked it as hard as she could, getting enough water in the boat to get wet, rocking

it so that it dipped water. On cross-examination by plaintiff's attorney, this testimony was given:

"Q. And the boat stayed on top of the water all the way until you got in?
"A. The boat stayed on top of the water.
"Q. You gave it a good thorough test, then?
"A. Yes, sir."

It has been stated that in the course of the trial a seat, assumed to be the back seat of boat No. 22, and an air tank, assumed to be the air tank which was under that seat, were produced. Testimony was introduced tending to prove that there were screws in the back seat which had evidently been at some time imbedded in wood and had been pulled out or loosened, there being particles of wood in the threads of the screws. One or more witnesses expressed the opinion that the condition of the particles of wood adhering to the screws indicated that the wood was rotten. Nothing had been done to boat No. 22 by way of overhauling or repairing for the season of 1912. Witnesses were permitted to testify that after the loss of the boat No. 22 they examined other boats belonging to defendant, used in its boat livery, and to describe to the jury the condition of those boats. Of this testimony the learned trial judge in his charge to the jury said:

"Now, lest we forget it, I want to say right here there was some evidence, introduced and submitted to you, tending to show what the condition of some of the other boats were that lay on the beach, a day or two after this unfortunate drowning occurred. I admitted that evidence with considerable reluctance, because you can see how dangerous it is for you to judge of the condition that one boat was in by the condition of another boat that happened to lay there. You all, as prudent and careful men, will see that that is dangerous, if you should say that, because a boat was found on the beach in a certain condition, this boat that was lost was in a similar condition. But

there was testimony in the case tending to show that these boats probably were all in the same condition. And so I said to counsel that evidence should go in, and I should deem it my duty to caution you as to the weight you should give it. I am not saying that you should not give it weight; that is for you to say. But I am cautioning you that it is of a different class of evidence, so far as the weight is concerned, than that of some one who had made an examination of this particular boat. And in determining the weight you will give that you must consider the testimony offered by the defendant as to the condition of these boats, and as to when this boat and other boats like it were repaired, and so on."

The testimony as to the condition of other boats did not tend to prove that the other boats were in one condition, but rather that they were in various conditions as to repair.

Defendant asked the circuit judge to direct a verdict for the defendant, because there was no evidence of defendant's negligence. Various other requests to charge were proposed on the part of the defendant and appellant, some of which were refused; the principal complaint being that the court refused to instruct the jury that it was not incumbent upon defendant's agent to see that the rented boat was not overloaded, and, akin to this, the request to charge that, if the boat was overloaded, that was the fault of the young men who invited others to use it with them. Error is assigned upon the refusal of the court to instruct that the occasion of the death of plaintiff's intestate was conjectural or speculative. Error is assigned, also, upon the charge as given, and upon the refusal to set aside the verdict and grant a new trial. It is well enough, in considering this case, to say in the beginning that the case is not made complex by alleging that defendant owed to plaintiff's decedent and his companions a multitude of duties, setting them out and alleging that each of them was breached. The case is really a very

simple one, if confined to the facts which the evidence tends to prove. The allegation of a multitude of duties, and the breach of them, in an attempt to meet any and every possible contingency which the evidence might present and almost all conceivable causes for the tragedy, is not condemned, and shows the careful pleader; but the apparent necessity for it, the uncertainty of the cause so indicated, betrays the idea, which will force itself upon any one who reads the record, that not inferences from known facts, and not presumptions, but pure conjecture alone, connects the alleged negligence of defendant and the death of these young people.

In the case developed there is no rough water, although the water was not perfectly smooth, no particular wind, no overloaded boat, no hiring of the boat to immature and tender youths. Lincoln was a high school graduate; Stocum was 16 years old. There is no testimony tending to prove that either was not perfectly at home in a rowboat; none that Lincoln, who so far as is known did the rowing, was not a capable oarsman. The ability of the boys, or of Lincoln, to navigate the boat, is demonstrated, as well as the fact that the boat did and could safely carry four persons. There is no testimony which tends to prove that the hull of the boat was infirm or that the boat leaked. The seats may have been loosened, or imperfectly fastened; but in use the boat was proven to be safe, with the load which it carried. As a witness for defendant, the owner of a similar boat, testified, and as is matter of common knowledge, it makes no difference about the wood "as long as the shell on the outside of the boat is whole, as long as there is a seat there to sit down on, and no leakage alongside of the shell, it is perfectly safe." Except the stern and, possibly, a small part at the bow, and a keel, the wood in the boat was all inside of the hull, or shell, and might

all of it have been removed without affecting the safety of the hull.

Lincoln and Stocum, after rocking the boat so as to give it some load of water, were not themselves affected with any evidence of infirmity in the boat. At no time were they seen or heard to give signals as if in trouble. Quite the contrary. The witness who found the hull to be flexible, yielding when he pulled upon its sides and when the oars were used, discovered only what most persons know who ever have used a metal boat, or one of any material built with laps, whether the laps ran longitudinally or latitudinally the boat. This boat, after the demonstration described, disappeared with its passengers. By all rules of probability, by all natural inferences from known facts, it ought to have come safely to shore, if properly managed, and if the passengers behaved as circumstances required. It is assumed that the boat sank. But what made it sink? What room is there for inference based upon established facts? Clearly there is none; established facts supporting conclusively no theory of destruction, but supporting best the inference, based upon demonstration, that the cause was not the infirmity of the boat. What may be conjectured? Plainly, several things. Some of the occupants of the boat attempted to exchange seats? The young men indulged in another rocking of the boat? Experience has proven these to be each of them common enough causes for capsizing boats and death by drowning. What right— logically—has one to say rather that the boat collapsed, supported as it was by water, or that it suddenly sprung a leak?

It is said that, no one having seen the boat when it disappeared, it is presumed that those on board her were using due care. Indulging this presumption, it is argued, we are left to find the cause of the catastrophe in the condition of the boat. This is not necessar-

ily so, and, if it was so, the known condition of the boat refutes such a conclusion. It is, however, more reasonable to say that we have certain phenomena to consider, and if we include among them the said presumption, it is still from all of them that we must determine, if we can, why the boat and its occupants disappeared. The presumption is not conclusive, and does not operate to bar consideration of all known facts. In the absence of evidence pointing to one cause rather than another, so long as the cause was plainly conjectural, it was proper to prove, as accounting, as well as anything which had been proven, for the disappearance of the boat, that the young men who were in it had indulged, a few moments earlier, in a pastime which was calculated to capsize the boat. In any event, the presumption referred to is indulged only to relieve a plaintiff from an inference of negligence, and not to supply evidence of the negligence of a defendant. It remains that, when last seen, and for a long time before, the boat was performing its duty, was demonstrably a sound and safe craft.

It may be said, and there is in the brief suggestion to the effect, that if the boat from any cause capsized it would then be of importance to have seats and air tanks safely and soundly attached to the boat. This may be admitted, since a hull which would not sink when filled with water might also support for some time, in certain conditions, persons thrown into the water. This consideration should not divert attention from the true question to be determined. Once it is assumed that the boat was capsized, did not by its own infirmity cause the hazard and crisis following its capsizing, plaintiff has failed in this action. Negligence and consequent liability of defendant is not, and cannot be upon this record, predicated of failure to furnish a boat which, when capsized, would float, supporting in the water four clinging passengers. Perfectly

secure and seaworthy rowboats will sink when filled with water. A frightened person, in the water, will drag down and be lost with wreckage which would have supported a fearless person. Defendant did not undertake to furnish a nonsinkable boat, if, indeed, there is any, except self-bailing boats, which can be called nonsinkable.

The facts established at the trial are not the facts stated by counsel and considered by the court in *Lincoln* v. *Railway Co., supra,* although it is probable that the trial court believed the decision in that case required this one to go to a jury. In my opinion, the court should have instructed the jury that negligence of defendant was not made out, and that, if in any respect found to have been negligent, it was purely conjectural whether the loss of the boat and of the lives was the result of its negligence.

The conclusion I have stated disposes of the case, and requires a reversal of the judgment. It is not deemed proper to refuse plaintiff a new trial, although upon this record there can be no recovery. If a new trial is had, some questions arising upon this record are likely to again arise. As to the right of the mother of decedent to maintain the action, it is settled in *Yost* v. *Railway Co.,* 163 Mich. 564 (128 N. W. 784, 31 L. R. A. [N. S.] 519, Am. & Eng. Ann. Cas. 1912A, 988). The testimony of the condition of other boats, examined after the loss of the particular boat, ought to have been excluded; its admission being error. A reason for its exclusion has been given. A further one is that little, if any, of it tended to prove the boats to be in a leaky or unseaworthy condition. Error was not avoided by a caution as to the weight to be given to the evidence. The weight of evidence is for the jury.

STONE, STEERE, and BROOKE, JJ., concurred with OSTRANDER, J.

KUHN, C. J. (*dissenting*). The negligence of the defendant became a question of fact for the jury upon the record here presented, for the reasons stated in my opinion in the case of *Lincoln* v. *Railway Co., post,* 504 (163 N. W. 969), handed down herewith.

The judgment should be affirmed.

BIRD and MOORE, JJ., concurred with KUHN, C. J. PERSON, J., did not sit.