# WESTLAND OIL CO. v. FIRESTONE TIRE & RUBBER CO.

### No. 12768.

Circuit Court of Appeals, Eighth Circuit.
June 26, 1944.

JOHNSEN, Circuit Judge dissenting.

———◆———

See, also, D.C., 3 F.R.D. 55.

William L. Prosser, of Minneapolis, Minn. (L. J. Palda, Jr., of Minot, N. D., and Robins, Davis & Lyons, Dorsey, Colman, Barker, Scott & Barber, and Charles F. Noonan, all of Minneapolis, Minn., on the brief), for appellants.

Herbert G. Nilles, of Fargo, N. D. (Henry S. Brainard, of Akron, Ohio, on the brief), for appellee.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This was an action for damages brought by appellant Westland Oil Company against appellee, Firestone Tire and Rubber Company, to recover damages resulting from a fire which it was alleged had been caused by the negligence of the Firestone Tire and Rubber Company. Appellants Hardware Mutual Insurance Company of Minnesota and Indiana Lumbermen's Mutual Insurance Company became plaintiffs by intervention on the basis of subrogation to a part of the Westland Oil Company's alleged damages because they had paid Westland Oil Company fire insurance covering a part of such fire loss. No issue is raised as to these insurance companies, and we shall refer to the Westland Oil Company as plaintiff and the Firestone Tire and Rubber Company as defendant.

Plaintiff at all times here pertinent was engaged in the production, distribution and sale of petroleum products and during such times defendant was engaged in the distribution and sale of tires, auto accessories and gasoline at Minot, North Dakota. Plaintiff was the owner of a steel bulk tank for the storage of gasoline, which was located on its property adjacent to a railway spur track, at Minot, North Dakota, and in 1937 it leased this storage tank to defendant. The storage tank was a horizontal cylinder thirty-three feet long and eleven feet in diameter, with flat ends. It was supported by a concrete foundation and a concrete sub-base and was set up on concrete piers two feet in diameter, with a steel frame work seven feet high and beams running across the uprights with a saddle on each section for the tank to rest on. The tank itself was made of steel, as were also the uprights and the saddle. It had a capacity of 23,459.7 gallons. At the top of this tank there was a manhole covered by a small dome through which passed the inlet pipe which went to within two feet of the bottom of the tank. Through this dome was passed a safety valve designed to equalize pressure by either admitting or releasing air. If the storage tank were filled beyond its capacity it would overflow from or through this safety valve. There was a small lid in the middle of this valve which could be lifted so that a gauge or measuring stick could be inserted without interfering with the valve mechanism. In the space under the storage tank there was a pump house containing pumping equipment. This pump house was located approximately underneath the center, which brought it directly under the safety valve. It was constructed of some 2 x 4s and sheet iron built up to the sides of the tank, the bottom of the tank serving as a roof for the pump house. In this pump house there was a fuel oil pump and also a gasoline pump. The gasoline pump only was in operation at the time of the fire. It was a rotary pump set on cement foundation and so constructed that it could pump gasoline either into or out of the storage tank. It was also used by plaintiff to serve its other adjacent tanks. There is no evidence when this pump had been inspected or repacked prior to the

fire. It was operated by an electric motor attached to it by a belt. The switch which controlled the motor was also in the pump house on wires coming from plaintiff's main building. It was an enclosed metal switch. In the main buillding, twenty-five feet from the storage tank, was a main switch which could be used to turn off the motor and pump.

While defendant had a written lease from plaintiff on the storage tank and pump, plaintiff agreed for a consideration to handle all operations in connection with the unloading of gasoline from tank cars into this storage tank and for that purpose retained exclusive possession and control of the pump house and pumping equipment.

It is alleged in plaintiff's complaint that while plaintiff controlled the actual process of unloading of gasoline from the railway tank cars, that defendant was obliged to check the contents of the storage tank and advise plaintiff when it might proceed with the unloading; that on the occasion of the fire, October 3, 1942, defendant failed properly to perform its obligation to check the contents of the storage tank for the purpose of ascertaining whether or not it would contain the contents of the tank car of gasoline spotted at the tank for unloading at that time; that defendant negligently gave plaintiff false or erroneous information and assurance to the effect that the storage tank would hold the contents of the tank car so spotted for unloading and directed plaintiff to proceed to unload the gasoline from the tank car into the storage tank, and that plaintiff, relying upon such assurance, proceeded, by use of the pumping equipment so installed, to unload the gasoline from the tank car into the storage tank; that while the process of unloading was going on the storage tank became filled to capacity and the gasoline overflowed and became ignited, causing serious damage.

Defendant's answer, with exceptions not here important, denied the material allegations of the complaint and affirmatively alleged that the fire was caused by the negligence of plaintiff and that plaintiff was guilty of contributory negligence.

At the close of plaintiff's testimony, the court on motion of defendant directed a verdict for defendant. From the judgment of dismissal entered on the directed verdict plaintiff prosecutes this appeal.

The sole question presented on this appeal is whether the court erred in directing a verdict for defendant. It is contended by plaintiff that on the evidence presented the jury might reasonably have found: (1) That defendant, both by express agreement and by a course of practice, had assumed the responsibility and legal duty of checking the contents of the gasoline storage tank and determining whether it would hold the quantity of gasoline to be pumped into it; (2) that on the occasion in question defendant negligently failed to exercise reasonable care in determining whether the tank would hold all of the gasoline; (3) that defendant negligently represented to plaintiff that the storage tank would hold the quantity of gasoline to be pumped into it and that this representation was false; (4) that as a result of such negligence of defendant, the gasoline overflowed from the storage tank in the course of pumping operations "and that the fire originated when this gasoline was ignited by a spark in the pump house underneath the tank."

The jurisdiction of the Federal court is based solely upon the diversity of citizenship of the parties. The question here presented must, therefore, be determined by the law of North Dakota. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Hudson v. Moonier, 304 U.S. 397, 58 S.Ct. 954, 82 L.Ed. 1422.

Where the court directs a verdict in an action founded upon negligence, the evidence must be construed most favorably to the party against whom the verdict is directed and he is entitled to such favorable and legitimate inferences as may reasonably be drawn from the evidence, and when so considered if it can be said that reasonable men may fairly differ in the conclusion to be reached therefrom, the case should be submitted to the jury. First Natl. Bank of Knox v. Bakken, 17 N.D. 224, 116 N.W. 92; Champlin Refining Co. v. Walker, 8 Cir., 113 F.2d 844; Standard Oil Co. v. Lyons, 8 Cir., 130 F.2d 965.

With these rules in mind we turn to a consideration of the evidence. Without going into details of the testimony, we are of the view that from the evidence submitted considered most favorably to the plaintiff, the jury might reasonably have concluded that there was an express agreement between plaintiff and defendant to the effect that plaintiff should have exclusive control of all unloading operations, including the making of all connections between

the tank cars and the storage tank, and the breaking of such connections, that it should have the exclusive control of operating the pumping equipment which it retained in its exclusive possession and which it was required to keep in proper repair; that defendant, however, was to check the contents of the storage tank and advise plaintiff when it might proceed with the process of unloading. The jury might also have found that this practice had been followed by the parties for a number of years prior to the time of the fire and that plaintiff for its services in connection with the unloading of the tank cars into the storage tank was to receive and did receive $2 per car. The jury might also have found that after the tank car of gasoline here involved had been spotted for unloading into the storage tank of defendant, defendant advised plaintiff that it had measured the gasoline in the storage tank. It might also have found that the storage tank would not and did not hold the entire gasoline content of the tank car; that the storage tank became filled, whereupon gasoline overflowed from the gasoline tank through the safety valve, running down the sides of the tank and into the pump house, which was without roof except that the bottom of the tank was utilized for that purpose. It might also have found that following this overflow, gasoline became ignited in the pump house and that an explosion and destructive fire followed.

The situation of the parties here is somewhat unusual in that plaintiff seeks to recover damages for a fire on its own premises, resulting from the operation of equipment in its exclusive possession and control and operated by itself. The sole negligence charged against defendant is that it failed to perform its obligation to check the contents of the storage tank and that it gave false information to the effect that the tank would hold the quantity of gasoline contained in the tank car which was to be unloaded. There is no direct evidence as to how the gasoline which overflowed from the storage tank became ignited. Many theories are advanced as to how it might have become ignited. As the equipment was in the exclusive possession and control of plaintiff which was charged with the duty of maintaining and operating it, it can not invoke the doctrine of res ipsa loquitur (Louisville & N. R. Co. v. Chatters, 279 U.S. 320, 49 S.Ct. 329, 73 L.Ed. 711), and proof of the fire can not give rise to a presumption of negligence on the part of one who was neither in possession nor control of the instrumentality which produced the casualty. Lynch v. Ninemire Packing Co., 63 Wash. 423, 115 P. 838, L.R.A.1917E, 178; Clark v. Detroit & M. Ry. Co., 197 Mich. 489, 163 N.W. 964, L.R.A.1917F, 851, Ann.Cas.1918E, 1068. It was incumbent on plaintiff to submit proof that defendant's negligence caused the fire, unaided by any presumption arising from the happening of the accident. The burden of proof did not shift and it was necessary, to entitle plaintiff to recover, that it prove a causal connection between the alleged negligence of the defendant and the happening of the accident. Plaintiff's argument places quite definite limitations as to how the fire originated. In its brief it says: "The fire originated when this gasoline was ignited by a spark in the pump house underneath the tank." In considering this contention we must make some further review of the evidence.

No living witness, so far as the record discloses, saw the actual outbreak of the fire. There was a muffled, metallic sounding explosion, which an expert witness testified might have been made by an explosion in the enclosed pump house under the tank, this being the only enclosure in that vicinity. The explosion was followed immediately by outcries and exclamations from Peter Dippong, who came "rolling out from under the storage tank with fire blazing all over him." His clothes were saturated with gasoline, and the fire when first observed came from underneath the tank toward the east end. Immediately following the explosion gasoline was seen coming out of the storage tank through the safety valve and running down the sides of the storage tank. Dippong exclaimed as he came from the pump house: "My God! My God! Get me out of here. We will all be burned. Why didn't they tell me that tank wouldn't hold the gas? They didn't tell me that that tank wouldn't hold the gas." In about fifteen minutes after the outbreak of the fire the storage tank burst and a flood of gasoline poured over the premises which were at once enveloped in flames. There was a fairly strong wind from the southwest which an expert witness testified would prevent gasoline vapor from collecting in combustible density on the ground or around the car, but if liquid gasoline overflowed from the storage tank it would be blown toward the east end· of the tank and would run down into the

pump house underneath the tank where it would collect and give off fumes which if ignited would cause an explosion; that if liquid gasoline were collected in the pump house there would be an initial explosion followed by a brief delay due to lack of oxygen, after which the flame would follow the gasoline back to the source of supply. The expert testified that ignition might come from a spark from the motor or from the switch when it was pulled off.

As has been observed, it was plaintiff who was operating and had charge of the unloading equipment. Defendant was not present and had no duty to perform in connection with such operation. Plaintiff was engaged in the handling of a highly inflammable and somewhat explosive material or substance. The process was obviously fraught with danger and required special knowledge and skill and the exercise of care commensurate with the hazards involved. Peter Dippong was plaintiff's oil chemist and plant superintendent and he was in sole charge of the pumping operations at the time here in question. He was a man of wide experience, having technical knowledge of the properties of gasoline and petroleum products generally. The duty to be performed by defendant as an incident to the unloading process was exceedingly simple and it was at plaintiff's insistence that the acts requiring special knowledge, skill, experience and care were not delegated nor entrusted to other hands than its own. Defendant in fact argues that the only purpose of checking the contents of the storage tank so far as it was concerned was for bookkeeping purposes and that the whole responsibility of transferring the gasoline from the tank car into the storage tank was with the plaintiff, and it is pointed out that even the rod used for measuring the contents of the storage tank was in possession of the plaintiff, where it was secured by defendant's employee whenever a measurement was made, and that when it gave its O.K. it simply signified that it had completed its measurements. At any rate, if anyone was in position to know or determine the reason for the gasoline becoming ignited, it was plaintiff and its employees. It had the burden of proving not only that defendant was negligent in the discharge of some duty in connection with the unloading of the tank car, but that such negligence was the proximate cause of plaintiff's injury. In the discharge of that burden it has attempted to prove that the fire was caused by the act of its employee Dippong in turning off the switch in the pump house in order to shut off the pump. It is argued that when the switch was turned off it emitted a spark which ignited the gasoline that had run into the pump house from the overflowing tank. While circumstantial evidence is competent to prove negligence or the cause of an injury, the circumstances must be such as to take the case out of the realm of mere conjecture. An inference of negligence must be based on a logical relation and connection between the proven facts or circumstances and the conclusion sought to be adduced from them. The circumstances must themselves be proved and can not be presumed. Chicago, M. & St. P. R. Co. v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 70 L.Ed. 1041. There is in the record no evidence as to when nor why Dippong entered the pump house, nor what he did there, after entering. There is no evidence that he in fact turned off the switch, nor, indeed, is there any evidence that anyone turned off the switch. The turning off of the switch might, in the circumstances disclosed by the evidence, have ignited the gasoline, but the turning off of the switch would not necessarily result in the emission of a spark. It was only a possibility, or at most a probability. If it could possibly be presumed or inferred that Dippong pulled the switch, there is no evidence that a spark resulted. It would be necessary to infer (1) that Dippong in fact turned off the switch; (2) that a spark was emitted from the switch when it was turned off; and (3) that the spark ignited the gasoline. Before inferring that the fire was caused by a spark from the turning off of the switch, there would at least have to be evidence that the switch was in fact turned off. A presumption must be based upon facts proven by direct evidence and can not be based upon nor inferred from another presumption. Greer v. United States, 245 U.S. 559, 38 S.Ct. 209, 62 L.Ed. 469; Chicago, M. & St. P. R. Co. v. Coogan, supra; Manning v. John Hancock Mutual Life Ins. Co., 100 U.S. 693, 25 L.Ed. 761.

The evidence presents a variety of possible causes. The tank car was not grounded as a protection against spark, yet the cover from the dome of the tank car was left open, leaving an opening of sixteen to twenty inches in diameter. Gasoline fumes are not only highly inflammable but are three and one-half times heavier than air. The running of gasoline through

pipes, as was done in unloading, may generate static electricity, and a motor driven pump with a belt, such as was here in use, may produce a static change, which if released may cause an explosion. There is no evidence to show that the motor pump or pipes were grounded, and if not they were a possible source of spark. The evidence indicated that fumes could escape while this unloading process was going on and be ignited by a static change which might cause either a fire or an explosion. The pump in fact did leak on occasions. There was no one in constant attendance during the unloading, which was confessedly an unsafe practice and violative of the regulations of the Interstate Commerce Commission promulgated pursuant to Act of Congress. Dippong during the unloading operations, was absent at various times for substantial periods. The pumping equipment was immediately under the middle of the gasoline storage tank and right beneath the manhole, and the pump house was without roof so that any overflowing of gasoline from the storage tank would enter the pump house. The electrical equipment was connected with plaintiff's lines and in the event of trouble there was a main switch in the building, only twenty-five feet from the storage tank, which could be used to turn off the motor and pump without risk or danger. To turn off a switch which was capable of emitting sparks was clearly dangerous where, as here, gasoline was running or dripping down onto the equipment. The proven facts are not inconsistent with the theory that the fire may have been caused by static electricity generated by the running of gasoline through the pipes; by the failure properly to ground the motor pump or pipes, thereby enhancing the danger of the possibility of escaping spark; by spark emitted from the motor; by the escaping gasoline fumes from the large opening in the tank car; by the failure of plaintiff's employee to be in constant attendance during the unloading process; or by the negligence of plaintiff in not stopping the pump by turning off the main switch.

To submit to the jury a choice between probabilities is to permit them to conjecture or guess, and where evidence is equally consistent with two opposing hypotheses it is without probative force and tends to support neither. Parker v. Gulf Refining Co., 6 Cir., 80 F.2d 795; E. I. Du Pont De Nemours & Co. v. Baridon, 8 Cir., 73 F.2d 26. As the proof rests upon circumstances, the circumstances must do more than bring plaintiff's theories within the realm of possibilities. Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568; Epperson v. Midwest Refining Co., 8 Cir., 22 F.2d 622. The verdict of a jury must have more than conjecture or surmise in its support. Balding v. Andrews et al., 12 N.D. 267, 96 N.W. 305; Scheid v. Cavanagh, 65 N.D. 596, 260 N.W. 619; Broughton v. Standard Oil Co. of N.J., 201 N.C. 282, 159 S.E. 321; Goulett's Adm'r v. Grand Trunk Ry. Co., 93 Vt. 266, 107 A. 118; McBride v. Paluxy Asphalt Co., Tex.Civ. App., 164 S.W.2d 32.

If we were able to grant the efficacy of the inferences urged by plaintiff to establish as a fact that Dippong went into the pump house after discovering that the gasoline was overflowing, for the purpose of turning off the switch, this would not strengthen plaintiff's case. The evidence produced by plaintiff disclosed without dispute that there was maintained in plaintiff's main building, within twenty-five feet of this storage tank, a switch which could have been turned off without any danger of igniting the gasoline overflowing from the tank. As we have already observed, plaintiff was in control of this unloading process and equipment. It was incumbent upon it to exercise skill and care commensurate with the known hazards of the undertaking. If, as claimed, the turning off of the switch in the pump house would probably result in emitting a spark, no one knew this better than plaintiff and its skilled employee, and to have turned this switch in such circumstances was clearly an act of contributory negligence.

We conclude that the court did not err in directing a verdict for defendant, and the judgment appealed from is therefore affirmed.

JOHNSEN, Circuit Judge (dissenting).

I am of the opinion that plaintiff made a prima facie case of negligence and proximate cause, and that the trial court therefore erred in directing a verdict at the close of plaintiff's evidence. On the record, the jury would have been entitled to find that defendant was negligent in checking the contents of the storage tank and in directing plaintiff to proceed with the unloading of the gasoline; that this negligence was responsible for the storage tank having overflowed; and that the gasoline

which thereby was caused to run down into the pump house was a proximate factor in occasioning the fire loss. It does not seem to me that it was any necessary part of plaintiff's case to explain what caused the overflowing gasoline to ignite. By common acceptance, any flow of free, vaporizing gasoline in a small enclosed pump house, with an operating motor, control switch, wiring connections, driving belt, and other static-producing contingencies, would constitute an inherent and unpredictable fire possibility. If it could be claimed that the fire actually was due to some defect in the machinery or other fault on the part of plaintiff, that was at most a matter of contributory negligence for defense, on which defendant had the burden. It would not involve any speculation or conjecture in relation to plaintiff's prima facie case. I would reverse the judgment.