George Leon ALBERTI'S ADMINISTRA-
TRIX (Estella Smith), Appellant,

v.

William G. NASH, d/b/a Nash's Lodge &
Dock, Appellee.

Court of Appeals of Kentucky.

Oct. 7, 1955.

Lovett, Lovett & Lovett, Benton, for appellant.

Wheeler & Marshall, Paducah, for appellee.

SIMS, Judge.

This action was instituted by Estella Smith, ancillary administratrix in Kentucky of George Alberti, a resident of Illinois, to recover $20,000 damages of William G. Nash, doing business as Nash's Lodge & Dock, for the alleged wrongful death of Alberti. At the conclusion of all the evidence the court directed a verdict for defendant.

Only two questions are raised on this appeal: 1. Did defendant breach an implied warranty that the boat he rented to Alberti and his companions was seaworthy and fit for the purpose defendant knew it was to be used; 2. was defendant negligent in not equipping the boat with life preservers and in permitting Alberti and his companions to take it out in "choppy" water?

The record shows these facts. On April 4, 1952, three young college students, George Alberti, Pete Bachourous and Albert Crass, came to Kentucky Lake from Illinois on a fishing vacation. Around 9 o'clock the next morning they rented a boat from an agent of defendant, who operated a fishing lodge and dock. The boat was the usual type used for fishing on Kentucky Lake and is commonly known as a "john boat". It was a snub-nose, flat bottom boat made of one inch cypress, 16 feet long, 54 inches wide across the top and 46 inches wide on the bottom, at its widest point, and was 19 inches deep at the oar locks. It had three seats, one in each end and one in the middle. The boat was equipped with a pair of oars, but there is some conflict in the evidence as to whether or not it contained life preservers.

Bachourous had a 5-horsepower outboard motor which he fastened on the stern of the boat. All three men were around 21 years of age and all were good swimmers and they got in the boat and went a short distance around a cove to fish. The wind was high enough to make the water "very, very choppy", and after they reached the cove it was difficult to keep the boat off the bank. They beached it and fished from the bank a short while. This proved unsatisfactory and they then put the boat back in the water and started trolling as they returned to the dock.

Bachourous was in the stern operating the motor and steering the boat; Alberti was on the front seat and Crass on the middle seat of the boat, both facing Bachourous. About 25 yards from the bank Bachourous became apprehensive of danger and said: "In case anything did happen to us, we should take off our jackets. * * * At that particular moment I made the suggestion the boat just completely sunk underneath us like a bar of soap". Crass and Bachourous swam ashore but Alberti, although a good swimmer, failed to make it and drowned, or died in the water.

Bachourous testified he was operating the boat at the slowest possible speed at the time it sank; that due to its snub-nose, the boat "did not cut the water", and he let the waves strike on the side of the craft rather than the front. "I tried to ride over the waves. We were trolling at the time. We were just crawling along". While Bachourous testified he was experienced in operating boats with an outboard motor, this was the first time he ever operated a flat bottom scow, or "john boat", with an outboard motor.

Counsel for plaintiff are correct in their statement of the law. The bailor of a fishing boat impliedly warrants its fitness for the intended purposes he knows it is to be used. Moore v. City of Ardmore, 188 Okl. 74, 106 P.2d 515, 131 A.L.R. 841; Clark v. Detroit & M. R. Co., 197 Mich. 489, 163 N.W. 964, L.R.A.1917F, 851, Ann.Cas. 1918E, 1068; 6 Am.Jur. "Bailments", § 195, p. 310; 8 C.J.S., Bailments, § 25, p. 258. These authorities state the implied warranty must be taken and understood in a reasonable sense and each case varies with the type of the chattel bailed and the ordinary uses to which it may be put.

It was said in the Moore opinion [188 Okl. 74, 106 P.2d 517]: "The implied warranty relates to suitability for the intended use, and the safety inherent in the ordinary use thereof. It is not a broad, absolute warranty, but one that will reasonably serve the particular case. If the bailed chattel is reasonably suitable for the designed use, and is free of observable defects, it seems to be difficult to require more. To require it to be suitable and safe to the extent of covering every contingency that might arise is to make the burden too great, even for a bailor for hire." And as was written in the Clark opinion (also a row-

boat case) [197 Mich. 489, 163 N.W. 968]: "Defendant did not undertake to furnish a nonsinkable boat, if, indeed, there is any, * * *." The Clark opinion further stated that where there was no evidence the hull of the boat was infirm and no evidence showing negligence on the part of the bailor, a verdict should be directed for him.

In the case at bar there was no evidence whatever that the boat was in an unsound condition, or that it was not the type commonly used for fishing purposes on Kentucky Lake. No fair minded person can read this record without coming to the conclusion that the "very choppy water" caused a wave to swamp the craft.

■ Plaintiff argues defendant was negligent in not equipping the boat with life preservers, and that he was also negligent in letting these young men go out in a flat bottom boat in "choppy water". This case was tried under the Civil Rules of Practice, section 18.01 of which permits the joining of cases growing out of a breach of contract with those arising from tort.

■ Our statutes do not impose upon defendant the duty of equipping this boat with life preservers. No reasonable person ventures upon water in a rowboat without some apprehension of danger that it may capsize due to any number of reasons. Since any reasonable person in hiring a rowboat to be used for fishing is presumed to be aware of this danger, the duty is on the bailee to observe whether or not it contains life preservers, as much as it is upon the bailor to furnish life preservers. As the bailee did not ask for life preservers in this instance, it cannot be said with reason the bailor breached a duty toward him

in failing to so equip the boat. This is the rule laid down in Moore v. City of Ardmore, 188 Okl. 74, 106 P.2d 515, 131 A.L.R. 841, 844. Another case which practically applies this rule, although it does not state it in so many words, is Clark v. Detroit & M. R. Co., 197 Mich. 489, 163 N.W. 964, L.R.A.1917F, 851, Ann.Cas.1918E, 1068.

The only other rowboat case we have found involving life preservers is Vignone v. Pierce & Norton Co., 130 Conn. 309, 33 A.2d 427, 430, where it was said there was a duty upon the bailor of a rowboat for use on a lake to outfit it with life preservers. It seems from the opinion this duty was imposed upon the bailor for hire because it operated power boats on the lake at great speed which caused high waves and it was reasonably to be anticipated these speed boats might cause a rowboat to be swamped.

■ Defendant owed the three men to whom he rented the boat no duty to warn them against going on the lake in choppy water. They were all practically 21 years of age and had discretion enough to determine for themselves whether the water was safe. Bachourous' testimony shows he was experienced in operating boats with outboard motors. If the attendant who rented the boat thought the water was not safe, he might have had a moral but not a legal duty to warn these young men of the "choppy water". This he said he did, which Crass and Bachourous deny. As there was no duty on defendant or his agent to warn these men of the danger of "choppy water", it cannot be said defendant was negligent in failing so to do.

The judgment is affirmed.