JAMES G. RIGGIN, RESPONDENT, v. FEDERAL CARTRIDGE CORPORATION, A CORPORATION, APPELLANT.—204 S. W. (2d) 94.

Kansas City Court of Appeals. Opinion delivered June 16, 1947.

*Madden, Freeman, Madden & Burke, John G. Madden, James E. Burke,* and *Ralph M. Russell* for appellant.

*Wilbur B. Ennis, Henry Depping, Hale Houts, Hogsett, Trippe, Depping & Houts* for respondent.

DEW, J.—Plaintiff sued for injuries to his right eye which he alleged was caused by the explosion of a defective cartridge negligently manufactured by the defendant. The verdict of the jury was for the plaintiff, and his damages assessed at $3000. From the judgment rendered thereupon, the defendant has appealed.

For convenience, the respondent and the appellant will be referred to herein, respectively, as the plaintiff and the defendant.

The gist of plaintiff's petition, as far as this appeal is concerned, is, in effect, that he purchased from Montgomery Ward & Company a box of shells, which had not been changed or disturbed in any way since delivery by the defendant, the manufacturer of the shells; that the shells were designed to explode instantly upon percussion of a firing pin of a standard make .22 caliber rifle in good condition; that after such explosion and the ejection of a lead bullet thereby, the operator of the gun would pull up the breech bolt, open the breech of the gun barrel, exposing the exploded shell to view, push back the breech bolt and the gun would eject the exploded shell container, making ready for another cartridge; that on the occasion of plaintiff's injury he used a rifle for which said shells were so designed and which was in good condition; that he placed one of said shells in the proper loading place and in the usual manner, pulled the trigger, and the firing pin struck the back end of the shell at a point where the percussion should have caused an instantaneous explosion of the shell, but the shell did not so explode; that plaintiff thereupon raised the breech, exposing the shell, and then, without further percussion or force designed to explode it, the shell exploded, throwing fine bits of metal against the face and into the eye of plaintiff. He pleaded that such delayed action of the shell was due to the negligence of

the defendant in the manufacture of the same, in a manner not known to plaintiff, and wholly within the knowledge of the defendant.

For answer, defendant, in substance, denied that it was negligent in any manner, denied that the shell had not been changed or dis- turbed since its sale by defendant, and further denied that the gun was in good working order. It also generally denied the other alle- gations of defendant's negligence. It further pleaded contributory negligence.

According to the evidence in plaintiff's behalf he purchased a box of .22 long rifle shells on the Saturday preceding July 4, 1940, from Montgomery Ward & Company at Kansas City. There had been a shortage of supply of such shells prior to that time at the place of purchase. He kept the shells in a dresser drawer at his home until October 20, when he, his wife and little girl, together with Mr. Owen, a relative, went to the latter's farm near Garden City, Missouri, to hunt. When the group was about ready to return home, the plaintiff put his own Winchester rifle in the trunk of the car. Plaintiff then borrowed Mr. Owen's .22 Mossberg rifle and shot a rabbit. He then undertook to shoot at a knot in a nearby post. The trigger snapped, but the gun did not fire. Plaintiff brought the gun down, thinking it was empty, and pulled the bolt back and there was a flash. The bullet was lying in the chamber of the gun. Plaintiff's eyes were from 14 to 16 inches from the shell. When the flash occurred plain- tiff felt something strike his eye, and could see nothing after that. Plaintiff had used Owen's gun on former occasions and had had no trouble with it. He had purchased the shells for Mr. Owen's gun, as his own gun used a different type. Plaintiff was taken to Harri- sonville, where he received tetanus injection, and later was taken to a hospital in Kansas City, where he was operated on. From the time of the accident he was in great pain. The operation consumed 45 minutes and he was detained at the hospital from five to eight days. There was evidence of his medical expenses, loss of time and permanency of the injuries sustained.

The exploded container of the cartridge involved was introduced in evidence as plaintiff's Exhibit 3, and an enlarged photograph of the same. Also shells shot in the same gun were introduced.

Plaintiff stated, in reference to the gun in evidence, that the pur- pose of the ejectors is to grasp around the outer rim of the shell and withdraw it from the chamber. He said he had never had the ex- perience of a shell jamming and twisting to one side, and denied that the shell which caused his injury was jammed or twisted. Several weeks after the accident he examined the gun again and did not see any discoloration in the breech such as would be caused by an ex- plosion in the open breech, but said that the gun had been used often since the accident. He said that probably five or ten seconds elapsed between the time he pulled the trigger and the time of the explosion.

Mr. Leslie Owen, brother-in-law of the plaintiff and owner of the farm where plaintiff claims he was injured, said that the gun in evidence belonged to him, and he had kept it at the farm. He said it was in good condition and that he had never had any trouble with it prior to or following the accident. He identified the gun in evidence as the same gun.

On cross-examination Mr. Owen said he had known of cartridges to snap and not go off, and that such shell is known as a "dud". He admitted that his rifle, the gun in evidence, makes a rectangular mark close to the outside of the rim of the cartridge when the firing pin strikes it, and does not make an indentation in the center of the rim. He said he had had experience with bolt action rifles of shell jamming; that is, when the shell would not come up into the chamber, or would come up backward, and sometimes when they would not come up at all. He had had some experience with rifles that had worn so that they would misfire. He had had the rifle in question since 1935. He said upon examination of the gun the following Sunday he did not find the breach or the bore leaded from the bullet. On several occasions the gun in evidence had snapped without exploding the shell. In such case he did not examine the firing pin of the gun, but presumed that it was the fault of the particular shell. The gun had not been cleaned on the day of the accident.

The tenant on the farm, Carl Schlesinger, identified the gun in evidence and said that Mr. Owen kept it in the bedroom of the farmhouse, where it had been at least since the previous September. The witness had used the gun several times prior to the date of the accident and had never had any trouble with it. He said when the accident occurred plaintiff had put his own gun in the car and was using Mr. Owen's gun, the one in evidence. He said that shortly after the accident he started to close the breech of the gun and it would not close. He took it into the house, and tried again to close it.

"Q. Did you hit anything against this piece of exploded shell, exhibit 3? A. Absolutely I did, when I pushed it against there and it wouldn't go shut.

Q. What did you hit it with? A. Well, the plunger or extractor on the bolt, when I pushed it.

Q. You shoved against it? A. I shoved against it to try to close the breech.

Q. Then what did you do? A. I went in and lit a light and looked at the gun.

Q. Did you find that piece? A. This piece was in there.

Q. You had shoved the bolt against it? A. I shoved that bolt action up against it.

Q. That is how you knew something was in there? A. Yes.

Q. When you shoved against it? A. That's right.

Q. What did you do with that piece? A. I laid it in the house. I wanted to show it to them when they came back.

Q. Did you find any other part? A. That part (indicating).

"Q. Anything except this exhibit 3? A. That's all".

Mr. Schlesinger further testified that he had placed the cartridges in the gun used by the plaintiff when injured; that he had used .22 long rifle cartridges out of the box identified by the plaintiff as purchased by him, or out of a box exactly like it. Witness noticed nothing unusual about the cartridges and had no difficulty loading the gun. He said that after the accident he tested some of the other cartridges left in the carton and that some of them snapped, and he threw away the ones that were left in the gun. Referring to the exploded cartridge in question, he testified:

"Q. The only mark on this shell that you claim you took out of the gun was the mark made by the ejector, wasn't it? A. The mark that is there is the same—I probably made that on the shell when I shoved it.

Q. Whatever happened, that mark is toward the center of the shell, within the center, isn't it? A. Yes.

"Q. There is no mark on the rim, is there? A. Well, there is a dent, yes.

Q. Is there any mark of a firing pin on the rim of that shell? A. Well, it looks like it could be a mark there. I think it could be.

Q. There is no such mark as appears on Exhibit 5 here, is there, of a firing pin indentation mark? A. I will agree there is not that kind of a mark, no".

He identified the photograph of a cartridge which had been fired with the same gun in connection with a previous trial. The witness cleaned the gun the following morning after the accident. He had looked at it the same night and had taken the shell out. He said that there is no doubt but that the firing pin of a bolt action rifle makes an indentation on the extreme outer edge of the rim of the shell. He put a rod down through the barrel and it was clean. He recalled that when he first examined the gun after the accident he found the cartridge had attached to the ejectors. When he had pushed the shell up he shoved the ejector against the shell.

An eye specialist in behalf of plaintiff testified as to the injuries to plaintiff's right eye and stated that in his opinion the condition could have been caused by being struck with a piece of exploded shell.

At the trial the defendant admitted that it manufactured the cartridges that were sold to Montgomery Ward & Company and by the latter sold to the plaintiff. The manager of the Montgomery Ward & Company retail store at Kansas City stated that all the cartridges purchased by that store from 1937 were purchased from the defendant, and that in 1940, the store would have on hand no cartridges purchased previously to 1937. He said that after receiving the car-

tridges from the defendant they are resold in the packages in which they come; that they are labeled by the defendant in the name of Montgomery Ward & Company; that while in his company's possession the individual cartons are not removed nor are they disturbed except to take them from the bulk packages.

Plaintiff produced Mosco Vallandingham, an expert in explosives. He had had long and very wide experience with explosives in the United States army, and with various large manufacturers of ammunition. Upon a hypothetical question he testified that in his opinion the delayed action at the time plaintiff was injured was due to a defective primer in the cartridge. He said the primer is the ignition charge which ignites the powder which propels the bullet through the barrel of the weapon. He said a primer might be defective because of improper mixture in the primer, or in placing the mixture in the primer when too dry, thereby permitting it to flake. He said in his opinion the ejector of the gun could not have caused the explosion, because it does not hit the primer hard enough to bend the edge of the rim down to the charge. He said the condition of the gun could not have caused the delayed action, because the primer or cap had already been struck. Upon the examination of the cartridge claimed to have caused the injury, he testified that, with a magnifying glass, he could detect two indentations, one very indistinct, above the letter "M", imprinted on the head, and another, which he said was plain to the naked eye, above and to the left of the letter "M", and which he said caused the cartridge to explode. He believed that the other indentation (in the inner circle around the lettering) came from the head of the bolt of the rifle. He explained that the reason that the indentation causing the explosion is not more deeply impressed is because the cartridge was exploded in the open, and in such event pressure is generated by the burning powder, causing gases which force out the indented surface. It was his opinion that the cartridge exploded before the large indentation in the center occurred.

Upon cross-examination Mr. Vallandingham said that age will affect the powder in the primer by decreasing the range and accuracy of it, but not otherwise. He explained that the reason that the slight indentations still appearing were not smoothed out by the pressure from within, was that if the indentation is a cut, it will not erase it, but if it is a punch mark by the firing pin, it will erase it. He said a rim fire could have a hang fire of five seconds, but he never heard of one for ten seconds. He said in making tests a very small percentage are tested, but that if a machine turns out 25 or 50 good cartridges, there is a very remote possibility of a bad one being in a lot previously run; nevertheless, he had known of misfires and hang fires from any company's ammunition both in his experience in the army and elsewhere.

Defendant's only witness was Ed. F. Bengert, an expert on fire arms. He had had many years' experience in repairing and remodeling guns for the Elliott Arms Company in Kansas City. After examining the gun in evidence and an enlarged photograph of the shell complained of, he said he could not see any indentation from the firing pin of the gun. He also examined the shell itself under a magnifying glass and said that the shell had never been struck by a firing pin. In his opinion the indentation shown was caused by the extractor pushing it into the chamber at a twist. He said that if there had been an explosion in the open breech of the gun there would be a discoloration there, and if exploded with the breech open or partially open it would leave the bolt in a leaded condition. He said he found no signs of leading in the gun in evidence. He denied that the explosion in the open breech would iron out the indentation. He had made tests and found that the open explosion had no effect upon the indentation of the firing pin. He could find no evidence of any force being exerted against the head of the cartridge complained of, nor in the picture of the same, except the extractor indentation. He had known of hang fire cartridges and had made some experiments regarding them and never had known one to wait five or ten seconds to explode.

Upon cross-examination the last above witness said that the Winchester special 22 automatic rifle could have caused an indentation such as shown in Exhibit 3 by pushing down the action of the gun, the cartridge not fitting; that it has a round firing pin, but that the rifle in evidence has a flat one. He said the cartridge is too small for the chamber of the Winchester, and would fall through. In explaining how the extractor may have caused the explosion, he testified: "You see, this is a tubular fed magazine. The case comes down and fits into a slot. The firing pin is up here. It comes from the magazine up here. This is a manual operation, and in a manual operation maybe it wouldn't come up high enough for the extractor to pick it up. In going forward the bullet could catch against this with pressure enough to where it could cause this rim to compress, which would cause friction on the primer". He explained that in his tests he put powder in empty shells and the lead back in, and placed them on a hot plate until they were ignited by the heat; that he put in the same quantity of powder as was in the shell in the rifle; that he did not put a primer in because it was not necessary when the ignition is by a hot plate. He said that Exhibit 3 was a rim fire cartridge; that the rim does not necessarily have to be hit to cause it to fire. He said that a delayed action is possible but before the operator could get his hand on the bolt and open it, the explosion would occur; that he had never known a hang fire to delay action over two seconds. His explanation of hang fires was that there might be a lazy striker, the firing pin going forward slowly, which causes a friction, and hitting the rim with less

force. "If the primer became in a dry state where it would be crumbly, that slight indentation may not be enough force"; that the delayed explosion would not be caused by a defective primer because the defect in firing would show up before the powder is put in. He said that delayed action would not be caused by a mixture that was too dry in the primer because it is wet when it is processed due to the heat, and if it is dry it will explode when mixed. He said if it did not get wet, it would fire before it could be placed in the case, and would just blow up.

Defendant's first point of error is that the doctrine of *res ipsa loquitur* has no application to this case because (1) it is lacking in the essential element of exclusive control by defendant of the instrumentalities involved; and (2) the facts relied on do not reasonably exclude every hypothesis other than defendant's negligence.

While the petition does plead general negligence and purports to set up a *res ipsa loquitur* case, plaintiff does not contend that the case was submitted to the jury on that theory, but asserts that he established his case on specific negligence. It is clear from the plaintiff's evidence that he abandoned the *res ipsa loquitur* theory and introduced evidence purporting to prove specific negligence. This he was entitled to do and if he did so, he was required to submit the case to the jury on the alleged specific negligence. [Grimes v. Red Line Service, Inc., 337 Mo. 743, 85 S. W. 2d 767, 769; Bergfeld v. Kansas City Rys. Co., 285 Mo. 654, 227 S. W. 106.]

But defendant next claims that there was no specific evidence of defendant's negligence; that the only claimed evidence of specific negligence on defendant's part was the "bare, bald opinion of a witness", claimed to be an expert, that the delayed action was caused by a defective primer; that even if this were true, such could have existed without any negligence of the defendant; that there is no evidence that defendant manufactured the primer or shell case, nor placed the primer in the shell case. Defendant admitted in the course of the trial that it manufactured the shells sold to plaintiff by Montgomery Ward & Company. This admission was not limited, and would include the primer, its contents and complete assembly. Plaintiff's evidence was that the shell claimed to have caused his injuries was taken from this lot; that those shells had not been exposed to any unusual handling in the hands of Montgomery Ward & Company, nor thereafter; that they had been recently purchased and were not old; that they were purchased for use in the Owen's gun, for which type and caliber the cartridges were designed; that none of the shells had jammed in that gun; that the gun had been used that day prior to the accident; that plaintiff successfully fired one of such shells through that gun just prior to the accident; that the second time he fired it, it "snapped" and when plaintiff opened the ejector, the shell exploded in his face; that thereafter some of the shells from the same carton

fired properly and others "snapped"; that plaintiff's expert witness recognized indentations on the exploded shell in question which, he said, showed that the firing pin had operated, but which indentations, he said had been almost completely ironed out by the inside pressure due to explosion in the open; that in his opinion, the delayed explosion had been caused by one of two things,—either that the mixture in the primer was improper, or that it had been placed in the primer in such a dry condition as to cause the mixture to flake. We cannot say that the opinion of plaintiff's expert witness was thus "bare and bald", without any facts to support it. It was based partly on the physical and other specific facts in plaintiff's evidence which, in his opinion as to the cause, presents two alternative theories, under either of which, if true, the fault would be in the manufacture. It is, therefore, not correct to say, as a matter of law, that under all of plaintiff's evidence there was no proof of specific negligence on defendant's part. [Morris v. E. I. Du Pont de Nemours, et al., 341 Mo. 821, 109 S. W. 2d 1222; McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S. W. 2d 122.]

The following rule announced in McPherson v. Buick Motor Co., 217 N. Y. loc. cit. 389, 111 N. E. 1050, 1053, was quoted and approved in the case of McLeod v. Linde Air Products Co., supra:

"If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully".

The Supreme Court in the McLeod case said that such principle should extend not only to poisons, explosives and deadly weapons, but "to a thing which when applied to its intended use becomes dangerous". See, also, Orr v. Shell Oil Co., 352 Mo., 288, 294, 177 S. W. 2d 608.

Actual knowledge of the defect on defendant's part in such cases needs not to be proved. [Jacobs v. Frank Adams El. Co., 97 S. W. 2d 847, 851.]

There was no evidence as to any test used by the defendant in the manufacture of the cartridge in question, or other similar ammunition made by the defendant, but plaintiff's expert witness testified concerning the nature, availability and effectiveness of tests for such articles in the course of their manufacture as follows:

"Q. . . . You say that, of course, every cartridge can't be tested? You have to sell some of them? A. That's right.

"Q. And all companies examine from time to time part of a lot? A. That's right.

"Q. And, of course, you have hang-fires in the same lot of those particular cartridges that have been tested by the same tests and O.K.'d, don't you? A. If you have a hang-fire in that lot of ammunition, with the companies that I have worked for, that ammunition is scrapped.

"Q. But my point is this, if you will follow me; you can test one cartridge and it tests O.K. but you still may have misfires and hang-fires? A. They don't test one. They test 25 to 50 cartridges.

"Q. How many cartridges are made by that machine? A. It would run up into many hundreds.

"Q. They necessarily test a very small percentage, don't they? "A. That's right.

"Q. And if those tested are O.K., the entire lot then is passed, is that right? A. If a machine runs out 25 to 50 good cartridges, there is a very remote possibility of a bad one being in a lot previously run.

"Q. You have known of it, haven't you? A. What?

"Q. You have known of misfires and hang-fires? A. Yes, and I know of ammunition being scrapped".

Defendant's sole witness, an expert on firearms, was asked:

"Q. Then you would say an improperly mixed primer charge can't cause a delay action? A. It would blow up before you got it in the case.

"Q. I thought you told me a while ago you could improperly mix the primer charge? A. I don't know whether you would call it improperly mixing or not, because they couldn't properly mix 50 cases and have one that wasn't properly mixed. They are either all bad or they are all good".

Given the defective article described in plaintiff's evidence in the instant case, not only dangerous inherently to life and limb, but made more so by the latent defect described, the jury could reasonably have inferred from the evidence that no proper test was made by defendant to prevent such faulty condition. While it may be conceded that defendant could not practically have tested every cartridge manufactured, it may as reasonably be inferred that the powder for the primer for the particular cartridge in question was not separately and especially mixed for that one cartridge, but for a substantial lot or quantity of them, and that proper test or tests could and should have been made to prevent putting the cartridge involved upon the open market. Under the evidence here it was not necessary to plaintiff's case that he further prove specifically that defendant negligently failed to test the cartridge in question.

As stated in Zesch v. The Abrasive Company of Philadelphia, 353 Mo., 558, 567, 183 S. W. 2d 140:

"It is said that if the nature of a thing manufactured is such that, when lawfully used for the purpose for which it is manufactured, it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger and the manufacturer of this thing of danger is under a duty to make it carefully. (Citations). And given an article which may contain a latent imperfection making the article reasonably certain to be a thing of danger (though it is carefully manufactured), where it is shown that the imperfection could be disclosed by a test, it would seem reasonable that the manufacturer in the exercise of ordinary care would be under a duty to make the test".

In our opinion the plaintiff made a submissible case.

Defendant next complains because plaintiff's Instruction A submitted to the jury the issue whether or not the shell was defective and dangerous in that the primer charge was placed therein while too dry, or that the ingredients thereof were improperly mixed. In that connection defendant again contends that there was no evidence that defendant manufactured the primer or placed such primer in the shell case of the cartridge in question. As heretofore stated, it was admitted in the trial that the defendant manufactured the shells sold to Montgomery Ward & Company and by that company sold to the plaintiff. This would include the primer, its contents, and the complete manufacture of the shell.

Finding no error in the trial of the cause, the judgment is affirmed. All concur.