Matt **SOSO**, Appellant,

v.

**ATLAS POWDER COMPANY**, Appellee.

No. 15546.

United States Court of Appeals Eighth Circuit.

Nov. 28, 1956.

Rehearing Denied Dec. 27, 1956.

See also D.C., 118 F.Supp. 535.

Cleo V. Barnhart, St. Louis, Mo. (J. Edward Gragg and William R. Schneider, St. Louis, Mo., on the brief), for appellant.

F. W. Schwarz, St. Louis, Mo. (John W. Scott, Joplin, Mo., Thomas J. Laffey, Jr., Robert P. Barnett, Wilmington, Del., and Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., on the brief), for appellee.

Before SANBORN, JOHNSEN and WHITTAKER, Circuit Judges.

WHITTAKER, Circuit Judge.

Appellant was injured by an unexpected explosion of dynamite manufactured by appellee and sued it for damages, charging that it negligently manufactured the dynamite by failing properly to mix the nitroglycerin and inert materials therein, and in negligently storing the same under improper temperature and ventilation conditions, and in selling the same for use with knowledge that it was defective.

The case was tried before a jury. The Court reserved ruling upon appellee's motion, made at the close of appellant's evidence and renewed at the close of all the evidence, for a directed verdict in its favor, and submitted the case to the jury, who returned a verdict for appellant in the amount of $40,000.

Appellee timely moved for judgment in its favor, in accordance with its motion for a directed verdict, notwithstanding the verdict of the jury, and the Court sustained that motion and set aside the verdict of the jury, and the judgment thereon, and entered judgment for appellee, upon the ground that appellant's evidence tended to show two possible causes of the explosion (one, that the ingredients of the dynamite were improperly mixed or stored, and, two, that the dynamite was detonated by improper tamping by appellant), for one of which possible causes appellee would be liable, but for the other not, which left the jury to choose, by guess and conjecture, between two equally consistent possibilities, and thus appellant failed to sustain the burden of proof, and did not make a submissible case for the jury.

From the judgment so entered by the Court below in favor of appellee, appellant has appealed to this Court, contending that his evidence, viewed in the light most favorable to him, made a submissible case for the jury, and that the Court erred in holding otherwise and in entering judgment for appellee.

The question presented necessitates a detailed analysis of the evidence.

The evidence, viewed in the light most favorable to appellant, shows that at the time of his injury, he was 55 years of age, and had many years of experience in setting and firing dynamite charges; that, at the time of his injury, he was employed by a contractor engaged in

digging a ditch for the laying of a storm sewer, near St. Louis, and they encountered a ledge of rock in the ditch about one foot thick which had to be excavated by the use of dynamite. A case of the necessary dynamite—40% gelatin dynamite—was obtained from appellee's magazine in that community and met with no abuse or mishandling from the time obtained from appellee to the time of the event in question.

On the morning involved appellant was directed by his employer to, and he did, drill three holes, between 4 and 5 inches deep, in the ledge of rock referred to with the use of an air drill, the bit of which was 1¼ inches in diameter, but the resulting holes were slightly larger.

While appellant was engaged in that work, his foreman, Todd, obtained from the toolhouse a stick of this dynamite, which was 8 inches long and about 1 inch in diameter and covered with heavy brown paper sealed at both ends, and, with his pocketknife, cut it into three approximately equal lengths, of about 2¾ inches each; that this left the dynamite, in the two end pieces, exposed only at one end, but left the dynamite in the center piece exposed at both ends; that Todd then, using a wooden stick about the size of a lead pencil, pushed a hole through the center of the length of each of the pieces of dynamite and inserted in each an electric dynamite cap two inches long—thus leaving about ⅜ of an inch of dynamite extending beyond either end of the dynamite cap, which, by the use of his fingers, he crimped over the ends of the dynamite cap and around the electric wires leading from one end thereof. Such a charge, containing a dynamite cap, is called a "primer" or "primer cartridge". Todd then wrapped the short length of electric wire, running from the dynamite cap, around each primer cartridge and then placed the three primer cartridges in a bucket, which also contained dry sand, and carried the same to the point where appellant was working and, by means of a rope, let the bucket down to appellant.

Todd then went back to the toolhouse and got the battery, used to fire the charges, and placed it on the ground some distance away from where appellant was working, and then unwound the wires leading from the battery and, holding the end of the wires, walked to the edge of the ditch in which appellant was working, and by that time appellant, using the primer cartridges made from the respective ends of the dynamite stick, had completed the loading of the first two holes for firing, and Todd says he watched appellant place the third primer cartridge—the one made from the center of the stick of dynamite and open at both ends—into the third hole and saw appellant push the same to the bottom of the hole with his tamping stick—which was an ordinary wooden broomstick—and then saw appellant reach into the bucket and obtain a quantity of sand between his fingers and his thumb and place the same in the hole and then saw appellant tamp "lightly" into the hole with the broomstick, whereupon the explosion occurred and appellant was injured.

The foregoing merely sets the stage, but the following facts develop and present the crucial question.

Appellant testified that before inserting these primer cartridges into the holes he examined them to make sure that dynamite "was pushed around the top and bottom of the blasting cap"; that he noticed that the third primer cartridge, "which had no paper on either end", had a "moldy spot" on one end "in the shape of a half moon". He said he had seen dynamite that looked like this on 11 or 12 previous occasions and, when fired, it made "a bigger noise". He says that he placed this primer cartridge in the third hole and pushed it to the bottom of the hole with the broomstick—that dynamite will not be fully effective unless pushed down to the bottom of the hole—and then reached over to the bucket and got some sand between his fingers and his thumb— a teaspoonful or a soupspoonful—and poured it in the hole, and then repeated that process. He then says "I then was

all ready, stick like this in it, I was going to raise (the broomstick), to use it and hit it a little bit down and before I hit it it went off while that stick was on top of the hole."

The other two charges were not detonated by the explosion and were later fired by Todd in the normal way.[1]

Though Todd had earlier testified that appellant was tamping the charge at the time of the explosion, appellant, on direct examination, maintained that he had not tamped the charge, but was only getting ready to do so when the explosion occurred, yet on cross examination he admits that he was tamping the charge and had tamped it "one or two strokes" when the explosion happened,[2] and at the argument counsel for appellant conceded that the evidence shows that appellant was tamping the charge at the time of the explosion.

Appellant then put on a chemical engineer, who qualified as an expert, and asked him whether in his opinion it was "safe procedure" to tamp "lightly with a wood tamping stick approximately the size of a broomstick" upon a dynamite charge containing an electric blasting cap—both of the kind, diameter and length heretofore described—in a bore hole in solid rock 4 or 5 inches deep and about 1¼ inches in diameter, covered with double the amount of sand that would normally be contained between the thumb and first two fingers of the hand, if the dynamite was in good condition, and the witness said "In my opinion, it would be safe to handle in that fashion."

Counsel for appellant then asked the witness to assume the same factors, and the additional one that while appellant was "lightly tamping" the charge exploded, and further asked the witness whether, under those circumstances, he had an opinion "as to what caused the premature explosion of the dynamite." The witness answered "yes", and he was then asked, "Q. And what is your opinion as to what caused the premature explosion?" His answer[3] was rambling and indirect, and

---

1. Though perhaps not material to the legal issue involved, it was stipulated by the parties that depositions, taken by defendant, if read, would show that appellee "had traced every single stick of dynamite from the 120 cases of dynamite which were manufactured at the same time as the stick of dynamite which injured the plaintiff and that none of the other sticks of dynamite in this 120-case lot was defective in any manner."

2. "Q. How many times did you tamp, did you say? A. Once or two.
"Q. You mean you took about one or two strokes with your tamper, pushed down once or twice? A. Yes.
"Q. That is when the explosion happened? A. That is right.
"Q. Well, now, do you still say today that you did not tamp it before it went off? A. You mean the first hole, was I tamping it?
"Q. When this accident happened, were you in the process of tamping that dynamite or the sand on the dynamite when the explosion went off? A. Yes sir.
"Q. You were in the process of hitting it with the tamping bar? A. I didn't say that I hit. You hit it, you hit it hard, it's different. You tamp it a little it's different altogether.

"Q. And you took that stick and you were tamping on top of the dynamite that had the cap in it, were you not? A. That is right."

3. The complete answer was: "Of course, the hazard in handling any dynamite is the possibility of separation of the nitroglycerin. That is the active—moisture active principal, and that is subject to shock and friction. Now, dynamite, of course, as is possible in any chemical operation of any kind, is impure—a lump of it in this case would be sufficient if it was genuine, would not stop all the nitroglycerin escaping the ferrous materials, or when stored, it is possible for the nitroglycerin to be exuded or separate from the coating of the particles, possibly so being replaced by moisture in the particular particles, so that it was displaced and would travel on someplace in the mixture over in the portions of the dynamite, whereas, a drop of it wouldn't. Of course, when subjected, is sensitive to the shock and friction, if it detonates, it would obviously and certainly set off the rest of the material. In safe handling of dynamite, the spark must be kept in mind. Nitroglycerin—if the nitroglycerin, instead of having it partially escape, gets accumulated into any kind of breakthrough, a particle then, of course, be-

involved a number of "possibilities" and assumptions not contained in the question, but, in substance, it was that in dynamite, there is the "possibility" of separation of the nitroglycerin from the inert materials, and that dynamite, as is "possible" in any chemical operation, is impure, and that when dynamite is stored, it "is possible" for the nitroglycerin to separate from the inert materials, "possibly" being replaced by moisture in the particular particles, so that the nitroglycerin would travel and accumulate in the mixture, and that "if" the nitroglycerin, instead of escaping, accumulates (at a focal point) the dynamite becomes hazardous to use, and he said dynamite "can become that way either by improper manufacture or in some way or another not having been thoroughly mixed, maybe just one drop in a large batch, or else by improper storage."

The witness was then asked: "Q. And is it your opinion, based upon the facts that I asked you to assume, that the dynamite—that I gave you in my hypothetical question—was defective for one or the other of those reasons, either that it was due to defective mixture or else it was due to a separation of a portion of the nitroglycerin from the other matter after it had been mixed?" He answered: "In my opinion, it would be, yes."

The witness then testified that if the dynamite was defective at the time of the explosion, it would have been defective one week earlier when it was acquired by appellant's employer from appellee.

The witness then testified that dynamite can deteriorate in storage; that "if" the magazine is not well-ventilated the dynamite would tend to "desensitize" so that it would fail to detonate; that an overheated magazine, or one ventilated only in the day-time, "can cause the nitroglycerin to exude and, therefore, become hazardous"; that by exuding he meant separation of the nitroglycerin from the inert materials so that the nitroglycerin "concentrates as an oily material", but such could not generally be seen on inspection, and "is not apt to be very obvious."

There was no evidence that this dynamite had been subjected to improper temperatures or to improper ventilation in storage, or that it had been improperly mixed, to support the "possibilities" indulged by appellant's expert as the basis of his opinion that the dynamite was defective.

But, on cross examination, this expert testified that a "primer cartridge" should never be tamped, because it has a blasting cap in it, and that it would create a "bad hazard" to tamp it,[4] and that the safe practical procedure would be not to "squash" the primer cartridge down in the hole with a tamper, but merely to fill the space around the primer cartridge, and to completely fill the hole, with sand.[5]

comes hazardous to use. It can become that way either by improper manufacture or in some way or another not having been thoroughly mixed maybe just one drop in a large batch, or else by improper storage."

4. The literal testimony was as follows:
"Q. 'The primer cartridge should never be tamped.' Do you agree with that? A. The primer cartridge, yes, the same reason as before.

"Q. And the reason that it is dangerous to tamp the primer cartridge is because it has a cap in it? A. That is right. That is the reason it is more hazardous.

"Q. Well, now then I follow you. You say the reason you should not tamp a primer cartridge is because it has a cap in it? A. That is the—yes.

"Q. That is the reason? A. That is the reason—it is a bad hazard.

"Q. Well, a bad hazard. What do you mean by bad hazard—because the cap is in it? A. Yes."

5. The literal testimony in this respect was as follows:

"Q. Well, would it be a practical practice, instead of squashing it down, to take sand and fill up all the space around the dynamite and on top of the dynamite—would it be a practical practice to do that? A. Yes.

"Q. Instead of taking a couple of pinches (of sand) and then striking them with a tamping stick? A. Yes.

Aside from evidence respecting the nature and extent of appellant's injuries, the foregoing is the substance of appellant's case, and there was nothing in appellee's evidence that aided appellant on the points in question.

 Appellant argues that this evidence, viewed in the light most favorable to him, was sufficient to make a submissible case for the jury. It is well-settled, and appellee concedes, that, in testing the question, the evidence must be viewed in the light most favorable to appellant. But this does not mean, as appellant seems to argue, only that part of the testimony adduced by appellant and his witnesses on direct examination. Rather, it means all the testimony adduced by the appellant, including that adduced on cross, as well as upon direct, examination.

Does the evidence of appellant and his witnesses, judged in the light most favorable to appellant, tend to show that the explosion occurred from a defect in the dynamite any more than it tends to show that it occurred from tamping the primer cartridge? If not, it would follow that appellant has shown two possible causes of the explosion, for the first of which appellee would be liable but for the second it would not be liable.

If we might consider only that part of appellant's evidence adduced upon the direct examination of appellant and his witnesses—from which view appellant seems to present this appeal—, there would be evidence (1) that the dynamite met with no abuse or mishandling from the time it was obtained from appellee to the time of the event in question, (2) that the charge was set in a safe manner, (3) that, except for Todd's testimony, the primer cartridge exploded before appellant tamped it, and (4), with the aid of permissible inferences, that the explosion was due to a defect in the dynamite, and

such would make a submissible case for the jury under the familiar Missouri authorities, relied on by appellant, of Morris v. E. I. DuPont de Nemours & Co., 341 Mo. 821, 109 S.W.2d 1222; McLeod v. Linde Air Products Company, 318 Mo. 397, 1 S.W.2d 122; Maybach v. Falstaff Brewing Corp., 359 Mo. 446, 222 S.W.2d 87, and Riggin v. Federal Cartridge Corp., 240 Mo.App. 206, 204 S.W.2d 94.

But, as stated, we cannot look only to the evidence adduced by appellant and his witnesses on their direct examinations, but must consider their cross examinations as well, and, when we do so, we see that, on cross examination, appellant admitted he was tamping the primer cartridge at the time of the explosion, and, on cross examination, appellant's expert said a primer cartridge should never be tamped, because it has a blasting cap in it, and that it would create a "bad hazard" to do so, and that the safe practical procedure, under the circumstances, would have been to have merely placed the primer cartridge in the hole and then to have completely filled the hole with sand.

Appellant's testimony thus showed (1) that the use of dynamite, in which the nitroglycerin has not been properly mixed with, or has separated from, the inert materials (left largely, if not entirely, to conjectural "possibility" under appellant's evidence in this case) may prematurely explode and is hazardous, and (2) that tamping a primer charge, as appellant admits he was doing at the time it exploded, may cause it to explode and is hazardous. In either case there may be an explosion, and, in these circumstances, a jury could only guess whether it was due to the one cause rather than the other.

Both the Supreme Court of Missouri and this Court have uniformly held that evidence which is consistent with two con-

"Q. And it would have been a much safer practice, would it not? A. Yes.
"Q. If the hole had been full of sand? A. Uh, huh.
"Q. So that dynamite would not have been compressed, isn't that correct? A. Yes.

"Q. So what you say about compressing this, is not a safe practice, is it, because you can do it, by putting sand all around it, safer? A. Yes, it can be shown that is somewhat safer.
"Q. That is safer? A. Yes."

flicting hypotheses tends to support neither, Hunt v. Armour & Co., 345 Mo. 677, 136 S.W.2d 312, 318; O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S.W. 55, 61; Massachusetts Protective Association v. Mouber, 8 Cir., 110 F.2d 203, 206; E. I. DuPont de Nemours & Co., v. Baridon, 8 Cir., 73 F.2d 26, 31; Westland Oil Co. v. Firestone Tire & Rubber Co., 8 Cir., 143 F.2d 326, 331; O'Brien v. Equitable Life Assurance Soc., 8 Cir., 212 F.2d 383, 389, and that such evidence shows only that both hypotheses are scientifically possible, Hunt v. Armour & Co., and Westland Oil Co. v. Firestone Tire & Rubber Co., supra, and that such evidence does not sustain plaintiff's burden of proving that the event was due to a cause for which defendant is liable, page 389 of the O'Brien case, and does not amount to substantial evidence of liability, page 316 of Southwestern report of the Hunt case, and that any verdict of a jury, in such circumstances, would necessarily be based on speculation and conjecture, page 318 of the Southwestern report of the Hunt case, and page 331 of the Westland Oil case.

In the light of the evidence and these legal principles, it is clear that the fact, shown by appellant's evidence, that the tamping of the primer cartridge could have caused the explosion was not eliminated from appellant's case, and, hence, it cannot be said—and there is no basis upon which for a jury to find—that the evidence shows that the explosion was due to a defect in the dynamite and was not due to the tamping of the primer cartridge, or that the explosion was any more due to the one cause than to the other, and, therefore, appellant's evidence showed two possible causes of the explosion, for one of which appellee would be liable but for the other it would not be liable, and, in consequence, appellant failed to carry the burden of showing that the explosion occurred from a cause for which appellee would be liable, and, hence, he failed to make a submissible case for the jury; and the action of the trial court, in setting aside the verdict of the jury and the judgment thereon and in entering judgment for appellee, accords with the requirement of the law in the circumstances and the judgment appealed from must be, and is hereby, affirmed.

Affirmed.