**R. H. MACY & COMPANY,
Plaintiff-Respondent,**

v.

**George BELL, Defendant-Appellant.**

**No. KCD 27599.**

Missouri Court of Appeals,
Kansas City District.

Dec. 8, 1975.

Elwyn L. Cady, Jr., Independence, for defendant-appellant.

William H. Sanders, Thomas W. Wagstaff, William A. Lynch, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for plaintiff-respondent.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

DIXON, Judge.

This appeal is by the defendant, George Bell, from an adverse jury verdict on a counterclaim against R. H. Macy & Company. The genesis of the litigation was a magistrate court suit in conventional form initiated by Macy's to collect from Bell an indebtedness of $1,676.23 for merchandise sold and delivered. Bell responded with a counterclaim bottomed on what has been termed "harassment." The counterclaim seeking $20,000 compensatory and $40,000 in punitive damages exceeded the jurisdictional limit of the original forum and the cause was transferred to the circuit court for trial.

Bell asserts trial error in the argument of counsel, in the refusal of the trial court to permit an exhibit to be passed to the jury, and in the trial court's refusal to read a federal statute to the jury. Macy's counters by asserting no error occurred and by a supplemental brief asserting Bell failed to make a submissible issue for jury determination on either liability or damages.

Bell had incurred the obligation which was the basis of the Macy suit while employed by Macy's. That employment was terminated in 1970; and, at the time of trial in 1974, Bell had paid less than $200 on the account in the four years preceding the trial. Macy's claim was admitted by Bell when the case commenced in the circuit court, leaving only the issues presented by the counterclaim to be determined.

Bell claimed that his mental "tranquility" was disturbed because of phone calls made to him by agents of Macy's in the efforts made to collect the account. The thrust of his petition and the ultimate submission of his claim of liability was that the phone calls were in violation of 47 U.S.C. § 223, which makes repeated telephone calls in interstate commerce "solely to harass" a criminal offense under the federal law.

The evidence which supports that theory of recovery considered in the light most favorable to the proponent demonstrates the following facts.

Bell testified at length concerning three specific calls, two of which occurred in the same day. The first call resulted from a note his sister left for him to return a call. Bell returned this call and asked to speak to a Miss Johnson whose name apparently was on the message. Miss Johnson was not in. Bell then mentioned that he was surprised because he thought the number he had called was for KUDL radio station and that a message had been left for him to call Miss Johnson so that she could ask him the question of the day; and if he could answer it correctly, he would win a prize and that it was very important for him to call her back. Macy's responded by informing Bell that he was not speaking to KUDL but, rather, to Macy's Collection Department. Macy's asked Bell who he was, and he told them, whereupon they proceeded to look up his account and asked Bell when he was going to make payment. Bell explained that he was unemployed and could not make payment on any bills at that time. Macy's replied that the situation had gone on so long that they had to have some kind of payment.

The afternoon of the same day Bell received a message to call "Stan." He tried several times without being able to reach Stan and finally talked to someone there

who would not give him Stan's last name. The purport of that conversation is reflected in the following questions and answers by Bell:

"Q. And what did you say to him and what did he say to you on that occasion?

A. I asked him if Stan was there and evidently he said no. I can't remember that I actually talked to Stan.

Q. I see.

A. And I asked and he said no and I said, 'Well, what is his last name?' He wouldn't tell me. And I asked him, 'Do you know what he wanted me for?' And he said, 'Well, it was probably regarding your account.' And I said, 'Well, with whom am I speaking?' And he gave his name, I don't know who it was, and he said it was Macy's credit collection."

Bell proceeded to discuss his account in the same terms as he had in the first call. He then made calls to another number that was listed on a second note, but found out the number, which had been a Macy's collection number, was disconnected.

Bell characterized these calls as "fraudulent."

Bell testified that in one of the last calls he received, ". . . they demanded that I talk to the man, that I find some means to pay them off in cash and he didn't care how it was, even if I had to go out and sell everything I had, . . . ." Bell characterized the tone of voice and type of language as extremely hateful, demanding and threatening.

Some calls apparently involved a neighbor. Bell's testimony here is extremely vague, but apparently on several occasions Bell called a number at the instance of a neighbor. The number turned out to be Macy's collection department and ". . . we would go through the same thing, only they were becoming more severe in their threats and demands then, and a couple of the last calls I didn't answer because I had

written them letters explaining my situation and I saw no reason to be bothered on the telephone after I had communicated with them by mail." In attempting to reach Bell by telephone, Macy's spoke to Bell's mother (over five times), Bell claims. Bell testified, ". . . as a result of that, I called Macy's and it was the same thing all over again, and I explained to them about calling and bothering my mother, about her age and the difficulty she has getting around and that I did not want them harassing her too."

Bell was called not only at his home but also at his place of employment, i. e., Shepherds in Kansas City, Kansas. He received "more than a few" calls there. "The only call that I can remember that was more severe than the others was the one where someone from the credit collection department called me at nine o'clock in the morning over there and demanded that I be at the Mission store before ten o'clock that same day and make payment in full or they were going to cause me more trouble than I knew what to do with." Bell was also called several times while employed at GEM. Bell had, however, asked Macy's not to call him at home.

Macy's collection records which were in evidence showed that beginning in May, 1971, calls were made monthly through the rest of 1971. Two of those calls indicated Bell's mother was reached and in one of them his sister responded stating Bell was ill. The suit in Magistrate court was filed in January, 1972.

In view of the ultimate disposition of this appeal on another ground, it will serve no purpose to detail all of the defendant's testimony concerning his claimed mental impairment. Condensed to ultimate fact, he claims his "emotional tranquility" was "disturbed." No medical evidence was offered except that Macy's produced in evidence a report by Bell's treating physician which did not attribute the mental difficulties to the actions of Macy's. Bell, in fact, claimed that his mental state was caused only in part by Macy's actions. Macy's put in evi-

dence that Bell had sued Standard Oil for $95,000, Duff and Repp for $130,000, GMAC for $200,000, and the Plaza Bank & Trust Company for $2,400,000, all such suits being an outgrowth of creditor-debtor relationships, and all but the last suit being counterclaims asserting telephonic "harassment" in the collection of debts. Bell unequivocally related his mental state to all these actions as well as some controversy with a veterinarian over the death of a dog.

Appellant's brief does not comply with the fundamentals of brief writing as required by the rules. The statement of facts is both meager and misleading. On the basis of the appellant's brief, it would be possible to deny relief for failure to comply with the rules. Appellant's counsel, who served at the trial as well as here, has suffered that fate on a variety of appeals in this court and continues the same faults. In this instance, however, the claims of error in the points of the brief are sufficiently stated that the basis for the appellant's claims appear. By resorting to the trial transcript, the general tenor of the trial appears, and some mention should be made of appellant's claims of error in the conduct of the trial.

The claims of error by appellant so far as they relate to the conduct of counsel relate to argument and conduct of Macy's trial counsel. Generally stated, they are a claim of personalizing the jury, a personal attack on Bell's counsel and improper argument outside the issues in the case.

Trial counsel for the Macy Company on the argument here admits with commendable candor that the claim of appellant as to error in the argument to the jury has validity. Claiming that it was invited by the ineptness of counsel, as well as retaliatory, the Macy Company seeks to avoid the inevitable consequence of this overreaching. If that were the only issue to be resolved, the balance would have to be struck in favor of a new trial. It is apparent that Bell's counsel was inept and opened areas of totally irrelevant inquiry which led to some of the complained-of argument. Proper response to such irrelevancies could be properly classified as invited or retaliatory, but the experienced counsel for the Macy Company went beyond the bounds permitted in such a case, a fact conceded in the oral argument.

Characterization of this branch of the case would be futile, consisting, as it would, of a primer of ineptitude in the presentation of Bell's counterclaim and a model of overreaching by Macy's counsel.

The disposition of the appeal, however, turns upon an entirely different ground. Macy's has, by supplemental brief, raised the fundamental issue of the submissibility of Bell's counterclaim. Where a plaintiff appeals asserting trial error and a claim is made by a defendant that no submissible case is made, that issue is reviewable. *Hughes v. St. Louis Nat. League Baseball Club*, 359 Mo. 993, 224 S.W.2d 989, 16 A.L.R.2d 904 (banc 1949). *Hart v. Midkiff*, 321 S.W.2d 500 (Mo.1959). *Lilly v. Boswell*, 362 Mo. 444, 242 S.W.2d 73 (1951). If, in fact, the counterclaim should not have been submitted, the issues of trial error are without effect in the ultimate disposition of the appeal. *Osborn v. McBride*, 400 S.W.2d 185 (Mo.1966).

The attack is made on two fronts, damages and liability.

Bell's counsel disclaimed at the close of the trial any claim for out-of-pocket expense connected with the complained-of acts of the plaintiff. So also, there was an explicit disclaimer of any impairment in the defendant's ability to work. Thus, the thrust of Macy's argument on damages is that Bell's failure to prove by expert testimony any causal connection between his claim that his "tranquility" was disturbed is fatal to proof of any damage. That issue might be a troublesome one in the state of this record, but before any issue of damages need be faced, some ground of liability and the necessary factual support should appear.

Thus, the critical and dispositive issue on this appeal is the determination of

whether the defendant made a submissible issue for the jury on the question of liability. As previously noted, the defendant predicated his counterclaim upon the assertion that 47 U.S.C. § 223 had been violated by the plaintiff and, in particular, subsection D of Section 223(1). In relevant part, the federal statute is as follows:

"Whoever—

(1) . . . in interstate . . . communication by means of telephone—

. . . . .

(D) makes repeated telephone calls, during which conversation ensues, solely to harass any person at the called number; . . ."

Assuming without deciding that appropriate proof of a violation of this federal statute would constitute an actionable tort in Missouri, the plaintiff has still failed to make the necessary proof even to raise that issue. The Federal court has construed the statute in the field of criminal law. *United States v. Darsey*, 342 F.Supp. 311 (E.D. Penn.1972). In that case, the court called attention to the legislative history of the statute. The court said (l. c. 313–314):

"To prevent the flooding of the Federal courts with complaints from persons who feel annoyed by some dealing they have had with another which happened to be by way of an interstate telephone call, Congress wisely imposed two very important and very strict conditions which must be proved before an offense under this section is established regarding conversations between people known to each other. First, the phone calls must be 'repeated'. The court takes this to mean repeated in close enough proximity to one another to rightly be called a single episode, and not separated by periods of months or years. This condition both requires the repeatedness as an element of the legally cognizable charge, and at the same time insures that the courts will not be flooded with complaints growing out of a single unpleasant call with some acquaintance. Second, the repeated calls must be made 'solely to harass' and not merely to 'annoy, abuse, threaten, or harass' as in the case of an anonymous phone call under § 223(1)(B). . . . Here Congress evidenced common sense in the affairs of men. In many situations, and most especially in romantic and family conflicts, a person may call another repeatedly and the ensuing conversations may be or become more or less unsatisfactory, unpleasant, heated, or vulgar. Up to a point these are the normal risks of human intercourse, and are and should be below the cognizance of the law. This Court does not read this section of law to extend to these situations, no matter how much sympathy it might have for one side or the other in such a conflict, unless some completely unjustifiable motive, such as revenge or cruelty, motivates such repeated contacts by interstate telephone calls between those known to each other. Only then can such calls be properly called 'solely to harass'.

If this section were drawn or interpreted any more broadly, countless people would be criminalized. The effect of such a law would be to encourage more vengeance than it prevented. And considering the potential burden on the available investigatory staff, the prosecution, and the courts, it is unlikely that more than a tiny and haphazardly random minority would ever be prosecuted. Congress has wisely limited the scope of § 223(1)(D) to the discouragement of certain clear and unjustifiable behavior, and in less clear cases left the world to struggle as before with the problems and aggravations of romantic and family disputes."

It is extremely doubtful that the evidence in this case would support a finding that the phone calls here were "repeated" in the sense in which the Federal court construed that word in the case last cited. But, nonetheless, it is clear on the record of this case that the calls made to the defendant by the plaintiff company's agents were not "sole-

ly" to harass the defendant. In fact, the evidence shows a continuing purpose in the calls for the collection of plaintiff's debt. That legitimate purpose pervaded all of the conversations between Macy's agents and Bell. Bell has wholly failed to prove an essential element of the case he submitted to the jury in that there is no evidence that any of the calls were made "solely" for the purpose of harassing him. Even Bell's own testimony clearly shows that the calls of which he complains were for the purpose of attempting to collect the amount which he now admits was due and owing to Macy's. The reading to the jury of the notice from the telephone company of the provisions of Section 223 would not have aided the submissibility of this cause nor would have the reading of the statute itself; those issues are likewise immaterial on this appeal.

The defendant did not seek to plead, prove or submit under the Missouri authority permitting recovery where a creditor has invaded the privacy of a debtor by aggravated and improper conduct in the collection of its debt by conduct so outrageous in character and extreme in degree as to bring it within Restatement (Second) of Torts, Sec. 46 (1964) and the Missouri case law adopting that theory of recovery as a part of the law of Missouri. *Liberty Loan Corporation of Antioch v. Brown*, 493 S.W.2d 664 (Mo.App.1973). *Biederman's of Springfield, Inc. v. Wright*, 322 S.W.2d 892 (Mo. 1959). Bell has not briefed the issue of submissibility and makes no claim of an ability to submit on any other theory nor any right to a remand for another trial on a different theory. Thus, in the posture of the present appeal and on the sole ground that Bell has failed to support the submission on the issue of liability, the judgment is affirmed.

All concur.