**James D. UDER, Administrator of the Estate of Charles David Uder, Deceased, and James D. Uder and Mary Uder, Appellants.**

v.

**MISSOURI FARMERS ASSOCIATION, INCORPORATED, and Dempster Industries, Inc., Respondents.**

**No. WD 32478.**

Missouri Court of Appeals,
Western District.

July 26, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied Sept. 28, 1983.

Application For Transfer Sustained Nov. 22, 1983.

Case Retransferred May 3, 1984.

Court of Appeals Opinion Readopted May 14, 1984.

Lynn Myers and Paul Rittershouse, Springfield, for appellants; Daniel, Clampett, Rittershouse, Dalton & Powell, Springfield, of counsel.

David W. Ansley, Springfield, for respondent Dempster Industries, Inc.; Woolsey, Fisher, Whiteaker, McDonald & Ansley, Springfield, of counsel.

Lincoln J. Knauer, Jr., and E.C. Curtis, Springfield, for respondent MFA; Farrington, Curtis, Knauer, Hart & Garrison, Springfield, of counsel.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

PRITCHARD, Judge.

Plaintiffs sued both defendants for the wrongful death of their son, Charles David Uder, who lost his life by having his clothing entangled in a power take-off shield of a fertilizer spreader being used by him. It was alleged in Count I of the third amended petition that the fertilizer spreader and the power take-off shield were defective, dangerous and unsafe in that they were improperly designed and constructed, being made of plastic of insufficient strength, and the nylon bearings were insufficiently protected from contamination; it contained a split in the shield; it was improperly mounted; it was deceptive in appearance in that it gave the appearance of being able to support the weight of a normal adult when in fact it could not; it was not free floating; it was, because of defects in design, manufacture and material, unable to withstand the rugged and heavy use for which it was intended; it was unable to protect the user from injury; and it gave no warning to the user of the danger of coming into contact with the shield. Plaintiffs had dismissed Counts II and III of the petition without prejudice.

A third party claim against G & G Manufacturing Company, which manufactured a conversion kit for the power take-off shaft for the spreader, and cross-claims between Dempster and M.F.A. were ordered severed for separate trial.

Dempster had manufactured the spreader and sold it to M.F.A., which leased it to Mr. Uder and his deceased son on February 7, 1976. Plaintiffs submitted their case against both defendants upon the theory

that when the spreader was sold and leased it was in a defective condition, unreasonably dangerous when put to a reasonably anticipated use. The jury verdicts were in favor of both defendants, and judgment thereon was accordingly entered by the court.

At the time the fertilizer spreader was originally purchased from Dempster, there was a metal protective shield on the power take-off shaft. M.F.A. experienced difficulty in keeping the metal shields in operating condition because of damage occurring in their use by farmers in spreading fertilizer over rough farm terrain. In 1974, Dempster sold to M.F.A. a conversion kit (manufactured by G & G to Dempster's specifications) which contained parts to raise the power take-off shaft farther away from the spreader tongue, with a new power take-off shaft with a plastic shield, the conversion kit being one unit or package as sold. This conversion kit was installed on the instant spreader by M.F.A. in August, 1974, and there was no further maintenance on the shield, nor was it removed nor the bearings changed up to February 7, 1976. From 1974 up to that time, the spreader had been rented out twenty times, with no trouble, once to the Uders on January 24, 1976.

After the two rented spreaders were pulled to the Uder farm, deceased connected an International tractor to the one with the plastic power take-off shield and went to a river bottom field to spread his load of fertilizer. After a time James Uder went down to check on his son's progress and saw that he had made three rounds on a 10 acre field, at which time the equipment was working. A little later he checked upon him again and discovered him entangled in the plastic shield of the power take-off, and determined that he was dead. After getting help, it was determined that deceased's entangled clothing, which had been stripped and bunched around his waist, was wound tightly around the front half (the female portion) of the plastic power take-off shield. Deceased was suspended from the power take-off shaft of the spreader, and was not resting on its tongue.

The plastic shield is made in two telescoping parts so that it may extend to make contact with the splines on a tractor PTO shaft. The back part is the male section which fits into the front female part. Each end has a protective bell-shaped portion of the plastic shaft which fits over a part of the universal joints at either end. Just back of the bell-shaped portions are nylon doughnut-shaped bearings which ride on the inside PTO shaft on smooth metal surfaces (the inside "race"), and on the outside race which is the plastic shield. The nylon bearings are held in place by snap rings, which must be depressed with a tool to remove the bearings.

At the time the deceased was found, the tractor was not running, its gear transmission was in neutral, but the power take-off was engaged. David Deputy, related to deceased by marriage, went to the scene with Kenneth Uder, deceased's uncle. Deputy found the deceased hung up in the machinery, the top part toward the tractor. His clothing which he helped cut away, was wrapped around the front portion of the power take-off shaft. No clothing was located to the rear of the front shield, none was below the bell of that female portion, and there was nothing in the U-joint of the tractor connection or in its locking pin. Where the wrapped-around portion of the clothing quit, there was a three-cornered tear in the plastic with a little area flap. Deputy did not see whether the back (male) portion of the shield was in place.

Kenneth Uder observed deceased's clothing wound around and four inches from the back half of the front shield. A rope was around the shaft, not around deceased's body. A pant leg was caught on a little piece of the shield that was sticking up. He could see the inside shaft through a split in the shield, but at no other place— the back shield was on the shaft.

Deceased's cousin, C.A. Uder, went to the scene after the body was removed. The PTO shaft was frozen on the shield. He grabbed hold of it and tried to turn it

but it would not turn. Witnesses Sanders and Deputy both also tried to turn the shield on the date of the accident, but the shield would not turn. C.A. testified that the back half of the shield was then on the shaft, but he could not remember that fact at the time his deposition was taken 1½ years prior.

Deceased's brother, James Bruce Uder, went to the accident scene after the body was removed. He examined the tractor and found the PTO locked in gear, the throttle in idle position and the transmission in neutral. Both halves of the PTO (plastic) shield were on. The shield was pretty well twisted and had some splits on it. He attempted to rotate the shield and it could be turned, but with difficulty. He had taken off the master shield on the tractor (which is above where the spreader PTO shaft connects to the tractor's spline) which deceased knew about. They discussed the danger—not to get close to the U-joint. He testified that it is easier to hook up power equipment when the tractor shield is off. Sometimes it must be driven on with a hammer.

The next day Wendell Uder, for about an hour to an hour and a half, spread the remaining fertilizer in the spreader. There is no evidence as to how the plastic shield and shaft operated at that time. Conceivably, if it was still frozen to the inner shaft, it would continue to turn therewith, and there was no evidence that the outer shield would then stop if there was some contact with it.

Plaintiffs' expert witness was L.W. Knapp, a professor at the University of Iowa. He had a Master's Degree in Agricultural Engineering, and had made studies for farm safety and power take-off accidents. He examined the instant plastic shield which looked like a wrung-out towel. [Knapp examined the power take-off shaft and shield without taking them apart. The trial court had apparently ordered that the power take-off or the power take-off shield not be dismantled or taken apart, that order being omitted from the legal file. M.F. A.'s expert, Gibson, however, apparently

after the order was entered, did take the apparatus apart twice, once in M.F.A.'s counsel's office, and about a year later during Gibson's deposition while plaintiffs' counsel was present and acquiesced therein. The matter of interior inspection of the equipment is touched upon further below.] When he attempted to turn the shield, it was highly resistant. He testified that the shield is designed "to prevent injury to someone who inadvertently comes in contact with it while it is operating. The principle being that the shield is to stand still upon contact with some foreign object. * * *." The stopping motion is allowed by retainer rings, usually made of nylon, at either end of the shield.

Knapp's opinion as to what failed when deceased got caught by his wrapped around clothing on the front (female) portion of the shield was that it failed to stand still upon contact, thereby seizing in some manner clothing of the individual and removing it to the point where he was drawn into it. That failure was due to the fact that it was not able to turn free upon the front portion of the power take-off drive. The failure to turn would, in his opinion, certainly be a defect in the shield.

On cross-examination, Knapp testified the two splits in the female shield, towards the equipment end, did not contribute to cause the accident. The splits were caused by the turning and twisting of the shield, causing it to change its diameter to become smaller—putting pressure on the inside of the shield to cause it to break in two places. He had given an opinion (apparently on deposition) that the bearings seized, but that was not based upon any examination of the bearings (in obedience to the court order against taking the plastic shield apart). At the time of his deposition, Knapp found the plastic shield highly resistant to turning. As to possible cause for the bearings to seize or freeze, it would be logical to have foreign material in that area—dirt, fertilizer or moisture. There would be a possibility of scarring or pitting of the material, of even being slightly deformed, a scratch or abrasions, and if used

after that there is a possibility of their being smoothed up again. [Note that if, when Wendell Uder spread the remaining fertilizer after the accident, the plastic shield turned in unison with the inner shaft, the smoothing of the bearing would probably not occur.]

James Uder, deceased's father, testified at trial that the back half of the shield was in place at the time of the accident, but admitted that he had previously testified on deposition that it was missing. He explained that he had the two rented spreaders confused, one having the back shield on. One shield was made of metal. He saw the two sons taking off the master shield on the tractor and told them to put it back on. They said that it was a smaller shield and they could not get the thing (PTO shaft) on. He had repeatedly warned them about safety. James had made a bigger shield for his tractor.

Joseph Powell, M.F.A.'s manager of its Facility Engineering Division, testified by deposition that he conferred with Dempster about the problems with the metal shields, and it did the design on the conversion kit. He agreed that the plastic shield rotates to some extent on the shaft, and when something comes into contact with it, because of the bearings on each end of it, the shield will stop and the shaft inside will continue to rotate. James Hawkins, G & G's General Sales Manager, gave like testimony as to the shield stopping on contact.

It was stated by counsel that G & G Manufacturing Company, which was severed from trial on a third party claim, had its expert, Jay Trexler, remove the inside or equipment of the shield to look at the shaft. Trexler did not testify. M.F.A.'s counsel stated that its expert, Gibson, removed the female portion of the shield at counsel's office some time before Gibson's deposition was given. He visually examined the shaft underneath, but "There were no tests performed except eyeball and fingertip rotation of the bearing." Some colloquy was had as to these examinations in connection with the court's order that the shaft not be dismantled but no sanctions

were imposed. Plaintiffs' counsel was permitted to argue to the jury their lack of opportunity to examine the nylon bearings.

Defendants' expert, Dr. Donald Gibson, examined the bearing, removing the snap ring behind the female bell, which enables the cover to be removed from the bearing to reveal its surfaces. He did not remove the bearing itself. He did not find some type of abrasion or a cut indicating that there had been a foreign material between the surfaces of the bearing which could have produced some sort of friction. He found only a little dust. Dr. Gibson found no evidence of the bearing freezing, and it was his opinion that it did not, giving as his reason that the bearings are nylon, designed to operate without lubrication which depends upon the slickness of the surface of the nylon and plating (on the metal shaft) material, "and the ability to induce enough friction by any means short of some foreign particle being in there that welds the two parts together just isn't there with the co-efficient of friction available under any condition of those bearings." He went on to testify that before the bearings would freeze both the inside and outside surfaces would have to bind, the probability of which is virtually nil. He did acknowledge that if the bearings did freeze sufficiently tight to permit clothing to be wrapped, and the bearing was capable of doing that, it would be a very, very defective bearing.

Dr. Gibson gave his opinion as to the cause of the accident: There was something in the U-joint or attached to the coupling pin (which locks the U-joint to the tractor PTO spline) which precipitated the damage to the shield. The coupling pin had a C-ring which was severely bent outward. The C-ring, a dent in the shield's forward bell housing, and the "towel" twisting marks of the shield, all lined up to cause him to conclude that something (a rope, clothing) got into the yoke of the U-joint, then around the shield to cause it to lock and continue to turn on the inside PTO shaft. He testified that the fact that nothing was found in the U-joint (a fact

omitted in the hypothetical question) would not change his opinion.

■ Plaintiffs contend that Dr. Gibson's opinion was not admissible because it was not based on evidence, i.e., that there was anything in the U-joint, and thus was speculation. As above set forth, his conclusion was based upon his examination of the physical condition of the C-ring, the bell housing and the twisting damage of the shield. These facts, which were in evidence, are a sufficient basis to support Dr. Gibson's conclusion and his opinion as to the cause of the accident, there being further testimony from him that there was no other cause of the accident which caused the shield not to turn upon contact with it under plaintiffs' theory. Compare *Riggin v. Federal Cartridge Corporation*, 240 Mo.App. 206, 204 S.W.2d 94, 99[2, 3] (1947), where plaintiff's expert witness examined a shell which had exploded in plaintiff's face, the indentations thereon showing that the firing pin had operated, but the indentations had been almost completely ironed out by the inside pressure due to the explosion in the open, the opinion being that the explosion had been caused by one of two things—either the mixture in the primer was improper, or that it had been placed in the primer in such a dry condition as to cause the mixture to flake. It was held that the expert's opinion was not "bare and bold". It was based upon facts physically in evidence. Compare also *Winters v. Sears, Roebuck & Co.*, 554 S.W.2d 565 (Mo.App.1977), where an expert's opinion as to a cause of a fire was held admissible as based upon his examination of a television set (allegedly which caused the fire) after the fire. Plaintiffs' contention that Dr. Gibson's testimony was inadmissible is overruled.

Plaintiffs' Instruction No. 5 submitted M.F.A.'s liability upon these hypotheses: M.F.A. leased the fertilizer spreader in the course of its business; the fertilizer spreader was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use; the fertilizer spreader was used in a manner reasonably anticipated; as a direct result of such defective condition as existed when the fertilizer spreader was leased, Charles David Uder died; plaintiffs sustained pecuniary loss; and "unless you believe plaintiffs, James Uder and Mary Uder, are not entitled to recover by reason of Instruction Number 6." [Instruction No. 6, set forth below, submits M.F.A.'s defense of contributory fault.]

■ Plaintiffs' Instruction No. 8 against Dempster submitted the same hypotheses as Instruction No. 5, except that the fertilizer spreader was in a defective condition when sold. M.F.A., by its Instruction No. 7, conversed all of the essential elements of plaintiffs' verdict directing Instruction No. 5 against it. Dempster, by its Instruction No. 10, conversed Instruction No. 8 thus: "Your verdict must be for defendant, Dempster Industries, Inc., unless you believe that as a direct result of such defective condition as existed when the power take-off shield was sold, Charles David Uder died." Defendants were entitled to their given converse instructions and under its converse instruction M.F.A. was entitled to *argue* any issue that the deceased put the fertilizer spreader to an abnormal use, that he did not use it in a manner reasonably anticipated, and, of course, that it was not in a defective condition unreasonably dangerous when put to a reasonably anticipated use, *as the circumstances in evidence may show. Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362, 366 (Mo.1969). That case, on the same page, holds that in addition to a converse instruction, the defendant may also submit the affirmative defense of "contributory fault", *if the evidence supports it.* To the requirement of evidentiary support for a contributory fault instruction, there may be added that the facts relied upon must not show contributory negligence for that would not be a defense in strict liability cases. *Keener*, supra, at page 365[4, 5].

Instruction No. 6, given for M.F.A., directed a verdict for it if the jury believe:

"First, when the fertilizer spreader was used, David Uder knew of the danger

as submitted in Instruction No. 5 and appreciated the danger of its use, and

Second, David Uder voluntarily and unreasonably exposed himself to such danger, and

Third, such conduct directly caused or directly contributed to cause any damage plaintiffs may have sustained."

For Dempster, Instruction No. 9 was given directing a verdict for it if the jury believe:

"First, when the power takeoff shield was used, Charles David Uder knew of the danger as submitted in Instruction Number 8 and appreciated the danger of its use, and

Second, Charles David Uder voluntarily and unreasonably exposed himself to such danger, and

Third, such conduct caused or directly contributed to cause any damage plaintiffs may have sustained."

Dempster seeks to justify the giving of its contributory fault instruction upon the evidence that deceased (and his brother) removed the tractor master shield, which is above the U-joint and yoke of the forward end of the PTO shaft of the spreader. He did not replace it against the admonition of his father, which taken with the testimony of Dr. Gibson that something got into the U-joint then wrapped around deceased and the plastic shield, thus binding it, shows that deceased used the spreader in an unreasonable manner. As stated in its original brief, Dempster puts the matter in these words: "Basically, the issue before this court is whether contributory fault of the plaintiff, or in this case plaintiffs' decedent, must be strictly limited to his appreciation of the danger of the product itself or whether contributory fault also includes appreciation of dangerous use of the product. In other words, does contributory fault also encompass an appreciation of danger in the manner in which plaintiffs' decedent exposes himself in the use of said product. Defendant Dempster believes and contends that where the evidence is clear that the decedent had knowledge of the dangers of using a PTO driveline when the U-joints are unguarded and where the plaintiffs' decedent further appreciated the danger of such use, that the defense of contributory fault is available to the defendant when it is sued based upon allegations that the product is defective."

Although counsel for M.F.A. stated in oral argument on the rehearing of this case, and now states in its supplemental brief, that it did not argue to the jury or rely upon any misuse of the spreader by the deceased in leaving off the tractor master shield as constituting contributory fault, the record and M.F.A.'s original brief refutes that position. M.F.A.'s counsel argued: "Now folks, I will read you Rule 1, it says in big letters, *be careful*, shields are for your protection, keep them in place. * * * Did he (deceased) know the danger when he and James took it off? You bet he did, because they took it off, yes, we know, and we decided that we would be just a little more careful. Well, he wasn't, maybe he was a little more careful, but maybe he tried for awhile and then he forgot. Maybe he was careful that day, but it is muddy and slippery, snow—a fellow can slip while climbing off of that tractor or for whatever reason, to adjust this level or to go to the bathroom or whatever. * * * Can you find that David Uder used the fertilizer spreader with the power takeoff train in a manner reasonably anticipated? Could we reasonably anticipate that he *ignored his warning sign*, that he took the master shield off?" (Italics added.) Then, in Point II of its original brief, M.F.A. sets forth: "The trial court properly submitted defendant M.F.A.'s Instruction No. 6, a contributory fault instruction, because: A. The instruction was supported by the evidence that operating the tractor without a master shield exposed a dangerous condition in use, which danger was known to and appreciated by decedent, David Uder."

Clearly, both defendants relied upon the antecedent prior act of deceased in removing the tractor master shield as constituting contributory fault. Both their instructions reference plaintiffs' verdict directors which submitted the ultimate fact that *the*

*spreader* was in a defective condition when sold and leased. There is no evidence that deceased knew that the PTO shield would continue to turn if he got into contact with it, or that he knew of any defective condition of the nylon bearing, which conditions plaintiffs' evidence tended to show as a possibility. Instructions Nos. 6 and 9 are not supported by any evidence that deceased knew of any dangerous or defective condition of the spreader, and defendants' evidence must show that he had that knowledge and voluntarily assumed the risk thereof. [M.F.A.'s argument that deceased was bound to know of the open and obvious condition of the plastic shield, i.e., cuts and splits, and a possible missing back portion is below considered.]

■ In the *Keener* case, it was held, in effect, that deceased must have known of the precise defect in the sump pump claimed by plaintiff to have caused his death—a missing ground wire, in order to support a contributory fault instruction. *Williams v. Deere & Co.*, 598 S.W.2d 609, 613 (Mo.App.1980), says, "Where the evidence does not show that plaintiff knew *the product* to be defective, he is not guilty of contributory fault by voluntarily exposing himself to a dangerous situation." (Italics added.) *Williams v. Ford Motor Company*, 454 S.W.2d 611 (Mo.App.1970), was a case of strict liability for breach of warranty of fitness, and a verdict and judgment for both defendants was set aside and a new trial granted by the trial court which was affirmed on appeal on the ground that a contributory negligence instruction was erroneously given. At page 619, the court considered whether the instruction might amount to one of assumption of risk or contributory fault, and held that it did not: "It does not make any reference to the discovery of the defect nor her awareness of the danger." And at page 619[14], the court held that there was not sufficient evidence to support the submission of that issue: "There was no evidence that she had knowledge of a defect which would suddenly cause the car not to steer at all. This defect was not discoverable until it had occurred." Clearly, these cases stand for

the proposition that for contributory fault instructions, to be proper, there must be evidence of awareness or knowledge of the precise danger in the defect asserted by the plaintiff, who thereafter voluntarily assumes the risk of *that* danger.

Cases from other jurisdictions support that proposition: In *Culp v. Rexnard*, 553 P.2d 844 (Colo.App.1976), defendant claimed error in the refusal of its instruction that Culp voluntarily and unreasonably proceeded to encounter a known danger in using a concrete mixer. Culp pleaded that the mixer was, due to various defects in design, unreasonably dangerous to users in that there was a failure to provide necessary safeguards to prevent the occurrence of such accidents. Culp admitted that he was aware that working around heavy machinery posed some degree of danger and that if part of his body got caught in the moving parts of the machinery, injury was likely. The court held that this evidence was insufficient to warrant the submission of the requested instruction, saying, page 845, "There was no evidence that Culp *had knowledge of the specific dangers arising out of the precise defects asserted, or that he voluntarily and unreasonably proceeded to encounter those dangers despite his awareness of the defects.*" (Italics added.) In *Seay v. Chrysler Corp.*, 609 P.2d 1382 (Wash.1980), plaintiff was loading a truck chassis on a convoy trailer. His evidence indicated that the accelerator linkage mechanism was defective and caused the accident. Defendant's evidence was that the top racks on the trailer had not been sufficiently raised so plaintiff was attempting to load a large chassis into too small a space, and offered a comparative negligence instruction based thereon. [This was obviously an act not referrable to plaintiff's claimed defect.] The court held that the comparative negligence statute was not applicable to cases of strict products liability so as to reduce the damages. In *Walker v. Trico Manufacturing Company, Inc.*, 487 F.2d 595 (1973), misuse, as an assumption of risk, of a blow-mold machine was not established where it was not shown

that plaintiff knew of the danger associated with an alleged defectively designed limit switch activated by her while her other hand was between the die faces. (Again, there was required to be knowledge of the alleged defective condition.) Rather important is the case of *Hastings v. Dis Tran Products, Inc.*, 389 F.Supp. 1352 (D.C.W.D. La.1975), applying the Louisiana law of products liability. There, a lineman suffered a 40-foot fall and injuries allegedly and found by a jury to have been caused by a defect in the fabrication or manufacture of a metal strap connecting a power line and a substation. The metal strap cracked, before plaintiff had attached his safety belt to a ladder, causing the power line and then the ladder, which he was on, abruptly to snap downward. The jury entered its verdict of damages caused by the defect as found but could not agree the question of whether plaintiff was guilty of negligence, in not hooking up his safety belt, as a proximate cause of his own fall. Note that the safety belt was a separate instrumentality from the alleged defective strap, similar to the facts here of the missing tractor shield being a separate device from the allegedly defective plastic shield on the spreader PTO. The court held that the failure to use ordinary care for one's own safety (the ordinary prudent man test) is not a defense in a products liability case, and in accordance with the jury's finding that there was a defect in the metal strap, the court reinstated its verdict. See also *Cartel Capital Corp. v. Fireco of New Jersey*, 81 N.J. 548, 410 A.2d 674, 682[6–8] (1980); and *Peterson v. Lebanon Machine Works, etc.*, 56 Or.App. 378, 641 P.2d 1165, 1167[2, 3] (1982).

Defendants cite and rely upon *Collins v. B.F. Goodrich Co.*, 558 F.2d 908 (1977), but that case, upon its facts, may be distinguished. There, the plaintiff, in inflating a T.W.A. nosewheel tire, disregarded a posted warning to use low pressure air only, attached a high pressure hose to a new tank of mitrogen, and after he removed that hose, the wheel exploded. Collins admitted that he knew that over-inflation of a tire can, by itself, cause a wheel to come apart. The instruction submitted for a finding that the manner of use of the nitrogen bottle was dangerous, that plaintiff knew it, and that he voluntarily and unreasonably exposed himself to that danger *and thereby caused his injury*, the verdict must be for defendant, which instruction was held to be proper. It is obvious that Collins' misuse of the high pressure air tank in inflating the tire activated or brought on the very defect that he asserted must have existed in the wheel itself. There is no evidence here that leaving off the tractor master shield activated the defect asserted by plaintiffs that the plastic shield failed to stop turning upon someone getting in contact with it while the PTO was engaged.

██ In this case, the arguments of defendants that the act of deceased in leaving off the tractor master shield constituted a misuse of the spreader goes only to his contributory negligence, which is clearly not a defense in this strict liability case. *Keener*, supra. Deceased's leaving off the master shield on the tractor would be no less an act of contributory negligence than his getting off the tractor, leaving its engine running with its PTO engaged so that the spreader shaft would continue to turn. This is not to say, however, that this matter was not admissible on the basic issue of causation, the defendants' version of which is supported by the testimony of Dr. Gibson, above detailed, including his opinion that the nylon bearing was not in a defective condition. The issue of causation of deceased's death, under M.F.A.'s theory that something got into the U-joint of the tractor PTO shield, then wrapped around the plastic spreader shield, thereby causing it to continue to turn and catch deceased's clothing, is properly covered by its converse Instruction No. 7. See MAI 1.03 and Committee's Comment (1981 Revision) thereunder; and compare *Cook v. Cox*, 478 S.W.2d 678, 682[8–11] (Mo.1972), "Instructions on sole cause are no longer permissible under MAI. Defendants conversed plaintiffs' submission of Cox's negligence as the proximate cause of plaintiffs' inju-

ries. Defense counsel had the right to argue the facts which would demonstrate that the accident was caused solely by another's negligence. *Gathright v. Pendegraft*, Mo.Sup., 433 S.W.2d 299, 308[12]." (1968). Note also *Coffel v. Spradley*, 495 S.W.2d 735, 740[11–13] (Mo.App.1973), and cases cited.

■ M.F.A.'s Point II B is that it was entitled to its contributory fault Instruction No. 6 because of the evidence of cuts, splits on the front (female) portion of the plastic shield, and the back (male) portion of the shield was missing. It says that these defects were open and obvious to deceased upon the hookup of the PTO, and it was entitled to argue them on the issue of deceased's voluntarily encountering a known danger. M.F.A. further says that these conditions were argued by both plaintiffs and Dempster as being causative of the accident. The trouble with the contention is that if either plaintiffs or Dempster received verdicts based upon these conditions alone, the verdicts could not stand because there was no evidence that cuts and splits, and the missing (if so) back half of the plastic shield, caused deceased's clothing to be wrapped around the front portion of the shield, as the evidence shows. Although the evidence conflicted somewhat as to whether the back half (male) portion of the plastic shield was in place at the time of the accident, there was no evidence at all that any of deceased's clothing was caught in that back portion. On the contrary, all the evidence showed that the clothing, and possibly the trip rope, was wound around the front (female) portion of the plastic shield. It was the testimony, on redirect examination, of defendants' expert, Dr. Gibson, that the splits on the end of the female shield could not possibly have been a catch point for clothing-the splits would not be strong enough to (do that). The lips (of the split) would pull back if clothing caught in the splits. And strangely, on a motion to the trial court made at the close of the evidence, one of M.F.A.'s counsel argued at length to the trial court that plaintiffs' argument to the jury be restricted so as to exclude any reference to: "1—

the issue of the cuts, tears, slits or whatever manner they have been referred to upon Plaintiffs' Exhibit Number 1 [the plastic shield in question], for the reason that there has been no competent evidence in the case at all that those cuts or tears or slits were upon the shield prior to the incident in question. And for the further reason that there has been absolutely no testimony to tie them up with the accident so as to show any causal connection between those conditions and the death of David Uder in any way. We further ask the Court to restrict the argument with regard to the absence, alleged absence of the rear half of the shield upon the power takeoff shaft, although there has been some testimony in the case that the rear shield was missing. There has been absolutely no testimony in the case to connect that up with the accident and David Uder's death. There is no causal connection whatsoever in the evidence between the absence of the shield and the death. * * * Getting back to the rear half of the shaft, not only has there been a total absence of causal connection but every witness has said that the clothing of David Uder was caught and he was bound by the front half of the shaft back to a point no closer than four inches or four and a half inches from the back end of the outer shaft, or shield. No witness has ever testified in any was (sic) in the rear portion of the shaft or at any point where the rear shield might have been missing and exposed the bare shaft. So that there is no testimony whatever of any causal connection."

Counsel was quite correct in his aforesaid argument to the trial court. Not only that, but all of the witnesses agreed that the plastic power take-off shield was designed to stop turning upon contact with it. Surely if deceased had been caught in existent tears and splits, the plastic shield would have stopped. [Although counsel for Dempster suggested to the trial court that an ambulance driver's testimony indicated that the clothing was wrapped around the rear half of the shield, the record does not support that suggestion.

Dempster does not rely on any such open and obvious defect on this appeal.] M.F.A. cannot now shift its position and contend here that its Instruction No. 6 was supported by an open and obvious defect, which clearly on its trial position, and under all the evidence, had no causal connection with deceased's death. The contention is denied.

M.F.A. raises for the first time after rehearing in this court the submissibility of plaintiffs' case in a supplemental brief filed without leave of court. Notwithstanding the belated raising of the issue, it will be considered. See *Gibbs v. Bardahl Oil Company*, 331 S.W.2d 614, 620[1] (Mo. 1960), where there was no assignment of error on appeal that the plaintiff failed to make a submissible case, the court saying, "However, the question of whether a submissible case was made is 'inherent in every case that comes to an appellant court' (*Lilly v. Boswell*, 362 Mo. 444, 242 S.W.2d 73, 77) * * *." See also *R.H. Macy and Company v. Bell*, 531 S.W.2d 58 (Mo.App. 1975), where the issue of submissibility of a counterclaim was first raised in a supplemental brief; *Anderson v. Maneval*, 410 S.W.2d 578, 581 (Mo.App.1966), and cases there footnoted.

All of the expert witnesses testified that the plastic shield was designed to turn in unison with the inner PTO shaft in normal operation unless there was contact with the shield in which event it would stop turning. This design was obviously for the protection of an operator of the spreader, and there was nothing in evidence here to put deceased on notice that the shield would continue to turn, and not stop, if he got into contact with it. As above set forth, plaintiffs' expert witness, Knapp, testified that what failed when deceased got caught on the front (female) portion of the shield was that it failed to stand still upon contact, thereby seizing in some manner clothing of the individual. That failure was due to the fact that it was not able to turn free upon the front portion of the power take-off drive. That failure to turn (free) would, in his opinion, certainly be a defect in the shield. Knapp did give a further

conclusion that the reason the shield failed to stop was that the inner nylon bearing froze. That conclusion was not based upon any evidence of a defect in the bearing itself, and was based upon his supposition that something foreign got inside the shield causing it to bind. That further conclusion was based upon speculation and conjecture, and the objection made to it at trial should have been sustained. It should be remembered, however, that Knapp never had an opportunity to examine and test the bearing, plaintiffs being in obedience to the court order not to dismantle the shield.

■■■ There is authority in this state and elsewhere that the existence of a defect in products liability cases may be inferred from the circumstances. In *Williams v. Ford Motor Company*, 411 S.W.2d 443, 447[3] (Mo.App.1966), defendants contended that plaintiff failed to make a case of implied warranty of fitness, in that her evidence failed to show a defect in the steering mechanism of a Thunderbird car. The court noted that if a new car is properly operated but does not turn in the direction it is steered, then it is not properly manufactured, and said, " * * * [T]he existence of a defect may be inferred, just as negligence may be inferred, from circumstantial evidence. See Frumer and Friedman, Products Liability, § 12.03[9], and cases there cited." The circumstances were listed at page 448, and the court said further, "From all this a jury could logically conclude that from the time Ford delivered the car to McMahon until the moment of impact, there was a defect in the steering mechanism; and that the defect caused her to run into the tree." Note the situation there, which is similar to Knapp's speculative testimony as to a defective nylon bearing. "True, she [plaintiff] tried to show the car's unfitness by describing the steering mechanism and its probable defect; but her real complaint was that the Thunderbird itself—the defendants' product—was unfit for normal use." See also the discussion as to inferences of defective condition in *Winters v. Sears, Roebuck and Co.*, 554 S.W.2d 565 (Mo.App.1977).

But more important to the present case is *Williams v. Deere & Co.,* 598 S.W.2d 609 (Mo.App.1980). There, one issue was whether there was sufficient evidence of a defect in a tractor which plaintiff put in a "park" position, then went behind it to adjust implements, when the tractor went out of "park" and rolled onto him causing injuries. There was evidence that the purpose of "park" was to keep the tractor from rolling forward or backward on level ground upon which it was at the time of the accident. The court said, page 612[2–4], "The doctrine of strict liability in tort does not require impossible standards of proof. The proof must be realistically tailored to the circumstances. [Citing *Winters,* supra.] The existence of a defect may be inferred from circumstantial evidence with or without the aid of expert evidence. [Citing *Williams,* supra.] Considering the evidence and the reasonable inferences from it in the light most favorable to plaintiff, we believe that the evidence was sufficient to show that a defect likely caused plaintiff's injury. There was evidence that the tractor was placed in park on level ground and that it should not roll when in park. Common experience tells us that some accidents do not ordinarily occur in the absence of a defect and in those situations the inference that a product is defective is permissible [Citing *Winters,* supra.] If it had been operating correctly it should have stayed in park and not rolled. Based on the evidence, the jury could reasonably find that there was a defect in the tractor which caused plaintiff's injury." [Analogously here, the jury could have found that the plastic shield, if operating properly, would have stopped turning, as a reasonable expectation, upon deceased's contact with it. Clearly, under the evidence, deceased's contact with it did not cause it to stop.]

The foregoing proposition as to the inference of the existence of a defect is succinctly stated in 63 Am.Jur.2d, Products Liability, § 130, p. 136: "In other words, if the product failed under conditions concerning which an average consumer of the product could have fairly definite expectations, there is an inference that there is some sort of defect, and a jury would have a basis for making an informed judgment upon the basis of a defect." See also, 72 C.J.S. Supp. Products Liability, § 72, p. 114; and Anno. "Strict Products Liability-Proof of Defect", 51 A.L.R.3rd 8, 15[b]. In *Heaton v. Ford Motor Co.,* 248 Or. 467, 435 P.2d 806 (1967), although not applying the rule to facts where plaintiff's truck wheel hit a rock in a road and later left the road and tipped over, the wheel then having a split rim, stated the rule thus 435 P.2d at page 808[4–6]: "In the type of case in which there is no evidence, direct or circumstantial, available to prove exactly what sort of manufacturing flaw existed, or exactly how the design was deficient, the plaintiff may nonetheless be able to establish his right to recover, by proving that the product did not perform in keeping with the reasonable expectations of the user. When it is shown that a product failed to meet the reasonable expectations of the user, the inference is that there was some sort of defect, a precise definition of which is unnecessary. If the product failed under conditions concerning which an average consumer of that product could have fairly definite expectations, then the jury would have a basis for making an informed judgment upon the existence of a defect." Note also: *Embs v. Pepsi-Cola Bottling Co.,* 528 S.W.2d 703, 706 (Ky.App.1975); and *Knapp v. Hertz Corp.,* 59 Ill.App.3d 241, 17 Ill.Dec. 65, 375 N.E.2d 1349, 1355 (1978). Under the foregoing authority, plaintiffs made a submissible case.

Plaintiffs complain of the exclusion of certain photographs of other damaged fertilizer spreader plastic shields. In the explanation attached to at least two of the exhibits, it was stated that the shields were difficult to turn on the shaft. Should plaintiffs, on retrial, wish to pursue the showing of a precise defect of the nylon bearings, those exhibits might be relevant, and of course, in that event, plaintiffs should be afforded the opportunity to dismantle the plastic shield and PTO, and to examine the

bearing, which PTO shaft is deposited as Plaintiffs' Exhibit 1 in this court.

Because of error in giving the contributory fault instructions, the judgment is reversed and the case is remanded for new trial.

All concur.